# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
———————————————————————X   Index No.
In the Matter of the Application of

MICHAEL AKSMAN,

                     Petitioner,                **NOTICE OF PETITION TO
VACATE ARBITRATION
AWARD**

For a judgment pursuant to
Article 75 of the C.P.L.R.

    -against-

GREENWICH QUANTITATIVE RESEARCH, LP,

                    Respondent.
———————————————————————X

      **PLEASE TAKE NOTICE** that upon the annexed Petition, verified on August 29,

2020, the affidavit of Michael Aksman dated September 8, 2020, the affidavit of Maria

Aksman dated September 8, 2020, the exhibits attached thereto, and upon all papers and

proceedings heretofore had herein, Petitioner, by the undersigned attorneys, will make

an application at the Supreme Court of the State of New York, County of New York,

located at 60 Center Street, New York, NY 10007, on the **7th day of October, 2020 at 9:30

in the forenoon**, or as soon thereafter as counsel may be heard, for an order vacating the

Arbitration Award dated June 26, 2020, in all respects on the grounds set forth in the

accompanying Petition; and granting such other relief as the Court deems just and

proper.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Civil Practice Law and

Rules, Section 2214(b), answering papers if any must be served within seven (7) days

prior to the return date of the within proceeding.

Dated: New York, New York
      September 8, 2020

PASKOFF & TAMBER, LLP

ADAM PASKOFF
*Attorneys for Petitioner*
MICHAEL AKSMAN
225 W. 34th Street, Suite 1303
New York, NY 10122
(212) 643-5454
skofflaw@gmail.com

TO:    *Respondent*
GREENWICH QUANTITAIVE RESEARCH, LP
330 Railroad Avenue
Greenwich, CT 06380.

AEGIS LAW GROUP LLP
*Attorneys for Respondent*
GREENWICH QUANTITAIVE RESEARCH, LP
801 Pennsylvania Avenue NW, Suite 740
Washington D.C. 20004
(202) 706-7031

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
————————————————————————X    Index No.

In the Matter of the Application of

MICHAEL AKSMAN,

                            Petitioner,          **VERIFIED PETITION TO**
                                              **VACATE ARBITRATION**
For a judgment pursuant to                         **AWARD**
Article 75 of the C.P.L.R.

     -against-

GREENWICH QUANTITATIVE RESEARCH, LP,

                            Respondent.
————————————————————————X

       Petitioner, MICHAEL AKSMAN ("AKSMAN") by his attorneys, Paskoff &
Tamber, LLP, as and for his verified petition herein, respectfully allege as follows:

       1.    AKSMAN brings this proceeding pursuant to Civil Practice Law and Rules
("C.P.L.R.") § 7511(b) seeking judgment vacating the Arbitration Award of the Arbitrator
Frank Maas in Matter of the Arbitration between Greenwich Quantitative Research, LP
("GREENWICH") against AKSMAN, JAMS Arbitration No. 1425031204, dated June 26,
2020 ("Arbitration Award") and served via email on July 14, 2020. The Arbitration
Award, which was determined on default, found AKSMAN liable for alleged fraud in
procuring employment with GREENWICH. A copy of the Arbitration Award is annexed
hereto as Exhibit "A."

       2.    AKSMAN alleges herein he was (a) deprived of due process because he was
never served with legal process of the Demand for Arbitration; (b) not subject to any
mandatory arbitration agreement because he was never became an employee of
GREENWICH; and (c) the Arbitration Award was not supported by the evidence or any
other rational basis, violates public policy, and was arbitrary and capricious.

## PARTIES

3.      AKSMAN is a resident of the State of New Jersey with a residence at 8 Kent Place, North Plainfield, NJ 07063.

4.      Upon information and belief, GREENWICH is a foreign Limited Partnership formed under and by virtue of the laws of the State of Delaware with a principal business address at 330 Railroad Avenue, Greenwich, CT 06380.

## JURISDICTION

5.      Upon information and belief, GREENWICH maintains an office and conducts business within the State of New York.

6.      GREENWICH initiated an arbitration proceeding within the State of New York without legal process upon AKSMAN resulting in an *ex parte* Arbitration Award awarded on default.

7.      This Petition to vacate and overturn an arbitration award is timely filed pursuant to C.P.L.R. § 7511(a).[1]

## PRELIMINARY ALLEGATIONS

8.      This proceeding is brought pursuant to C.P.L.R. § 7511 to vacate and overturn the Arbitration Award.

9.      Upon information and belief, the arbitration proceeding was initiated by AKSMAN on or about November 8, 2019, by the filing of a Demand for Arbitration Form filed with "JAMS" for an arbitration hearing to be conducted at the JAMS New York Resolution Center.

10.     The alleged basis for arbitration was "[t]he arbitration provision... located at Section 8, pages 8-9, of the Parties' Restrictive Covenants Agreement." Upon

---

[1] Respondent does not concede proper service of the Arbitration Award pursuant to C.P.L.R. § 7507 and specifically reserves all rights under law.

information and belief, a true and complete copy of the Restrictive Covenants Agreement dated March 7, 2019 (the "Restrictive Covenants Agreement") is attached as Exhibit "B", without signatures of the respective parties.

11.     The Restrictive Covenants Agreement purportedly amended and restated an original agreement dated October 24, 2017, in its entirety.

12.     The Restrictive Covenants Agreement presupposes that AKSMAN is an "Employee" wherein it states "[t]his Restrictive Covenants Agreement (the 'Agreement'), is made as of the 7th day of March, 2019, between Greenwich Quantitative Research LP and the employee signatory hereto ('Employee')."

13.     The Arbitration award states that pursuant to the Restrictive Covenants Agreement "Aksman further agreed that, <u>in consideration of his employment,</u> "any and all controversies, claims, or disputes with anyone (including [Greenwich] and any employee, officer, director, stockholder or benefit plan of [Greenwich] . . . ) arising out of, relating to, or resulting from [his] employment with [Greenwich] or the termination of [his] employment with [Greenwich], including any breach of th[e] Agreement, shall be subject to binding arbitration" at JAMS, pursuant to the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), "before a sole arbitrator who shall be a lawyer." (Emphasis added).

14.     At or about the time the Restrictive Covenants Agreement was executed, the parties executed a letter of employment dated March 7, 2019 (the "Employment Agreement"). Upon information and belief, a true and complete copy of the Employment Agreement is attached as Exhibit "C", without signatures of the respective parties.

15. The Employment Agreement states that it supersedes an original agreement dated October 24, 2017 and extended by letter agreement on January 28, 2019, in all respects.

16. Other than the purported employment, there was no other good and valuable consideration for Petitioner to execute the Restrictive Covenants Agreement.

17. This Petition seeks to vacate and overturn the Arbitration Award on the basis of:

      a. Service of process of the arbitration proceeding was never legally effected upon AKSMAN depriving him of due process;

      b. AKSMAN was never an employee of GREENWICH;

      c. The Restrictive Covenants Agreement was made without any consideration and is therefore null and void;

      d. The Employment Agreement only became effective upon conditions precedent that never occurred; and

      e. The Arbitration Award was not supported by the evidence or any other rational basis, violates public policy, and was arbitrary and capricious.

## STATEMENT OF FACTS

18. In or about 2017, the parties began negotiations for GREENWICH to hire AKSMAN as a Senior U.S. Portfolio Manager resulting in an original offer of employment dated October 24, 2017 and extended by letter agreement dated January 28, 2019.

19. The original offer of employment was superseded in its entirety by the Employment Agreement (Exhibit "C").

20. The Employment Agreement in all circumstances was subject to the GREENWICH raising sufficient investor capital to support a minimum of $250,000,000 Gross Market Value in trading positions by June 30, 2019 to be allocated to AKSMAN for AKSMAN's trading book.

21.     Unless otherwise agreed to by the parties in writing, the Employment Agreement was to become null and void if GREENWICH did not raise the $250,000,000 by the June 30, 2019.

22.     GREENWICH was required to give AKSMAN notice that the $250,000,000 was raised so that employment could commence.

23.     After employment was to commence, AKSMAN was to render services to GREENWICH, and AKSMAN was to perform such duties and responsibilities as may be designated by GREENWICH from time to time, commensurate with AKSMAN's title and position.

24.     AKSMAN's commencement of employment was to be no later than the earlier of 10 business days following receipt of notice that the $250,000,000 was raised; or June 30, 2019.

25.     Additionally, GREENWICH was required to provide AKSMAN with the capacity to hire Eugene Belozersky as an employee of GREENWICH and Leon Aksman as a consultant capped at an aggregate annual base salary of $350,000.

26.     Additionally, GREENWICH was required to pay AKSMAN a base salary of $250,000 per annum payable semi-monthly and subject to applicable tax withholdings.

27.     Additionally, AKSMAN would be entitled to an incentive bonus payable sixty (60) days after the end of the fiscal year and subject to applicable tax withholdings.

28.     Additionally, AKSMAN would be entitled to participate in GREENWICH's Equity Profit Participation Plan.

29.     Additionally, AKSMAN would be entitled to participate in GREENWICH's annual bonus plan.

30. Additionally, AKSMAN would be entitled to participate in GREENWICH's health, welfare, vacation and other benefit plans from time to time in effect for similarly situated employees of GREENWICH generally.

31. Upon information and belief, at no time did GREENWICH raise $250,000,000 allocated to AKSMAN for AKSMAN's trading book.

32. At no time did GREENWICH give AKSMAN notice that it raised $250,000,000 to be allocated to AKSMAN for AKSMAN's trading book.

33. GREENWICH never allocated $350,000 to hire Eugene Belozersky as an employee of GREENWICH or Leon Aksman as a consultant.

34. At no time did GREENWICH pay AKSMAN an annual base salary of $250,000 subject to applicable tax withholding.

35. At no time did GREENWICH pay AKSMAN an incentive bonus.

36. At no time did GREENWICH permit AKSMAN to participate in GREENWICH's Equity Participation Plan.

37. At no time did GREENWICH permit AKSMAN to participate in GREENWICH's annual bonus plan.

38. At no time did GREENWICH permit AKSMAN to participate in GREENWICH's health, welfare, vacation and other benefit plans.

39. AKSMAN never became an employee of GREENWICH or received any benefits from GREENWICH attributable to employees of GREENWICH.

40. The Employment Agreement became null and void on June 30, 2019.

41. The Restrictive Covenants Agreement was subject to AKSMAN becoming an employee of GREENWICH.

42. AKSMAN received no consideration from GREENWICH for execution of the Restrictive Covenants Agreement.

43.    That without employment by GREENWICH and the benefits associated with employment, AKSMAN would not have executed the Restrictive Covenants Agreement.

44.    GREENWICH's Demand for Arbitration improperly and mistakenly listed AKSMAN's address as 400 Washington Avenue, Martinsville, NJ 08836, which was not AKSMAN's address when the Demand for Arbitration was filed on November 8, 2019.

45.    The Arbitration Award acknowledges that "[f]or service of process to be effective, it must satisfy the due process requirements of the Fourteenth Amendment, which means that the defendant be given adequate notice of the claims being made against him. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313-14 (1950)."

46.    The Arbitration Award, however, fails to substantiate proper service of process.

47.    The Arbitration Award alleges that counsel for GREENWICH "notified [AKSMAN] of the pendency of this proceeding by emailing a copy of the Demand to him at his email address, maksman123@gmail.com, and sending a second copy by Federal Express to his residence, 8 Kent Place, North Plainfield, New Jersey 07063".[2] This is not proper service.

48.    The Arbitration Award acknowledged that the Federal Express package was returned to sender.

49.    The Arbitration Award acknowledges that the arbitrator conducted an *ex parte* Preliminary Conference on January 15, 2020, setting forth March 16, 2020 "as the deadline to complete discovery and April 16, 2020, as the date for the evidentiary

---

[2] Service at this address is disputable because the Demand for Arbitration executed on the same date improperly and mistakenly identified Petitioner's address as 400 Washington Avenue, Martinsville, NJ 08836.

hearing." Said *ex parte* Preliminary Conference was held without proper notice or due process upon AKSMAN.

50. The Arbitration Award justified the *ex parte* Preliminary Conference because notice was "emailed" to AKSMAN on January 13, 2020.

51. The "emailed" notice was performed prior to any attempted service of process of the Demand for Arbitration, thereby depriving AKSMAN of due process to participate in the proceedings.

52. The aforesaid Preliminary Conference was conducted prior to any attempt to legally effect service of process on AKSMAN.

53. The Arbitration Award summarily presumed employment by stating "[a]fter he [AKSMAN] was hired…", without ever establishing the date of employment for AKSMAN.

54. The testimony in support of GREENWICH as restated in the Arbitration Award indicated that GREENWICH's founder and Chief Investment Officer, Gene Reilly, "anticipated launching the fund in late 2019" which is substantially contradictory to AKSMAN's Employment Agreement which became null and void on June 30, 2019.

55. Further, the Arbitration Award acknowledges that GREENWICH was still trying to raise capital in "July 2019", which is after the Employment Agreement became null and void on June 30, 2019.

56. The Arbitration Award additionally confirms that AKSMAN could never have been an employee of GREENWICH because in assessing damages the arbitrator acknowledged that GREENWICH "maintains that it had a $150 commitment from a large state pension fund which… would have permitted it to launch its fund" which is a far cry

from the \$250,000,000 required by agreement to be raised by June 30, 2019, a condition precedent to AKSMAN becoming an employee of GREENWICH.[3]

57.     The Arbitration Award alleges that AKSMAN's wife was personally served on January 16, 2020 in satisfaction of Section 4:4-4(a) of the New Jersey Rules of Court.

58.     AKSMAN denies that at any time he or his wife received any service of process at AKSMAN's place of residence.

59.     The Arbitration Award is devoid of describing at which address service of process was allegedly made, which is critical given the improper and mistaken address provided in the Demand for Arbitration.

60.     While AKSMAN denies any attempt of service at his residence upon his wife or any other individual, the Arbitration Award supports the lack of proper service of process in that the arbitrator merely presumed service on AKSMAN's wife.

61.     The Arbitration Award next identifies purported service on AKSMAN by the process server walking up to a vehicle at a stop sign and handing papers to the passenger identified as the AKSMAN. Not only does this defy credibility, AKSMAN denies that any such service was ever attempted and its description as pure fiction.[4]

62.     The calculation of damages was specious by the arbitrator in that it was based upon investment monies that GREENWICH did not have and there is no degree of certainty that GREENWICH would have raised such, if any, capital. This is supported

---

[3] Assuming arguendo that the arbitrator meant to say \$150 million, this is still far short of the agreed upon amount which is a condition precedent for AKSMAN to become an employee of GREENWICH, subjecting AKSMAN to the terms of the Restrictive Covenants Agreement.

[4] Respondents would have this Court believe that after proper service was allegedly made pursuant to statute upon the wife at Petitioner's residence, the process server continued to stake out the residence. But rather serve Petitioner upon exiting his house, the process server chose to catch up to a moving vehicle at a stop sign and serve an individual in the passenger seat through a window which presumably was closed because it was in the middle of winter on January 16, 2020.

by the fact that GREENWICH was unable to raise the minimum amount required by the Employment Agreement, as a condition precedent to employment.

63.     Further, the arbitrator improperly found damages based on assessment of lost profit for $3,087,480 during its first year of operation since AKSMAN was (a) never an employee of GREENWICH; (b) AKSMAN was an at-will employee, so there is no basis to project out one year; and (c) investment trading profits are speculative at best and the market drastically declined due to COVID-19 and oil price war between Russia and OPEC countries, through no fault of AKSMAN.[5]

64.     Additionally, the Arbitration Award provided that GREENWICH recoup attorneys' fees and expenses of $174,707 through March 31, 2020 for legal services that essentially amounted to two telephone conferences with the arbitrator and a one-day Zoom arbitration consisting of one witness. This is excessive by any stretch of the imagination.

65.     Lastly, AKSMAN claims an award of punitive damages in the amount of $750,000 is grossly excessive under the facts of this case.

66.     The Award is irrational, defies common sense, and is against public policy.

67.     No prior request for the relief set forth herein has been requested from this or any other Court.

---

[5] The Arbitration Award was issued on July 14, 2020, the stock market suffered from historic lows. "From 24 to 28 February, stock markets worldwide reported their largest one-week declines since the 2008 financial crisis… On 9 March, most global markets reported severe contractions, mainly in response to the COVID-19 pandemic and an oil price war between Russia and the OPEC countries led by Saudi Arabia… During March 2020, global stocks saw a downturn of at least 25%, and 30% in most G20 nations. On 20 March, Goldman Sachs warned that the US GDP would shrink 29% by the end of the 2nd quarter of 2020, and that unemployment could skyrocket to at least 9%." *Wikipedia.com*, "2020 stock market crash".

## STANDARD OF REVIEW

68.    An arbitration decision should be set aside when Petitioner was not afforded a fair hearing. *In re in re Fenster*, 234 A.D. 868, 868 [2d Dept 1931]. Moreover, vacation of the award is proper where an arbitrator has a personal, adverse interest against one of the participants. *Petroleum Cargo Carriers, Ltd. v Unitas, Inc.*, 31 Misc. 2d 222, 220 N.Y.S.2d 724, 1961 N.Y. Misc. LEXIS 2403 (N.Y. Sup. Ct. 1961), aff'd, 15 A.D.2d 735, 224 N.Y.S.2d 654, 1962 N.Y. App. Div. LEXIS 11750 (1st Dept 1962). The basis of such vacation can be in pre-hearing and *ex parte* discussion. *Intercontinental Packaging Co. v China Nat'l Cereals, Oils & Foodstuff Import & Export Corp.*, 172 App Div 2d 224, 568 NYS2d 730 (1st Dept. 1991); *Spitzer Electric Co. v Fred Girardi Constr. Corp.*, 147 NYS2d 40 (1955); *See* C.P.L.R. § 7511; F.A.A., 9 U.S. Code, Title 9.

## AS AND FOR A FIRST CAUSE OF ACTION

69.    AKSMAN repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "68" of the Petition, inclusive with the same force and effect as if set forth more fully herein.

70.    Pursuant to C.P.L.R. Article 75, the Arbitration Award must be vacated because the Award was not supported by the evidence or any other rational basis, violates public policy, and was arbitrary and capricious.

## AS AND FOR A SECOND CAUSE OF ACTION

71.    AKSMAN repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "70" of the Petition, inclusive with the same force and effect as if set forth more fully herein.

72.    Pursuant to C.P.L.R. Article 75, the Arbitration Award must be vacated because the arbitration clause relied on by the arbitrator was not controlling on the parties and AKSMAN was not the subject of mandatory arbitration.

73.     At no time did AKSMAN consent to mandatory arbitration.

74.     At no time did AKSMAN become an employee of GREENWICH.

75.     There was no consideration for the Restrictive Covenants Agreement.

### AS AND FOR A THIRD CAUSE OF ACTION

76.     AKSMAN repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "75" of the Petition, inclusive with the same force and effect as if set forth more fully herein.

77.     Pursuant to C.P.L.R. Article 75, the Arbitration Award must be vacated because service of process was not effected upon AKSMAN, thereby depriving AKSMAN of due process.

WHEREFORE, AKSMAN respectfully requests a judgment vacating the Arbitration Award, or in the alternative, remanding the case to a new arbitrator for a new arbitration, and granting AKSMAN costs fees and disbursements together with such further relief as the Court deems just and proper.

Dated: New York, New York
       August 28, 2020

                                    PASKOFF & TAMBER, LLP


                                    ADAM PASKOFF
                                    *Attorneys for Petitioner*
                                    MICHAEL AKSMAN
                                    225 W. 34th Street, Suite 1303
                                    New York, NY 10122
                                    (212) 643-5454
                                    skofflaw@gmail.com

TO:     AEGIS LAW GROUP LLP
        *Attorneys for Respondent*
        GREENWICH QUANTITAIVE RESEARCH LP
        801 Pennsylvania Avenue NW, Suite 740
        Washington D.C. 20004
        (202) 706-7031

*Respondent*
GREENWICH QUANTITAIVE RESEARCH LP
330 Railroad Avenue
Greenwich, CT 06380.

## VERIFICATION

MICHAEL AKSMAN, being duly sworn, deposes and says:

I am the PETITIONER. I have read the foregoing VERIFIED PETITION TO VACATE AN ARBITRATION AWARD and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true. To the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of these papers or the contentions therein are not frivolous as defined in subsection (c) of section 130-1.1 of the Rules of the Chief Administrator (22 NYCRR).

_____
MICHAEL AKSMAN

Sworn to before me this
29th day of August, 2020

_____
Notary Public
My commission expires:

TELIAH M. WARREN
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 8, 2024

## EXHIBIT LIST

EXHIBIT A:  Arbitration Award dated June 26, 2020;

EXHIBIT B:  Restrictive Covenants Agreement dated March 7, 2019;

EXHIBIT C:  Employment Agreement dated March 7, 2019;

EXHIBIT D:  Affidavit of Michael Aksman dated September 8, 2020; and

EXHIBIT E:  Affidavit of Maria Aksman dated September 8, 2020.

# EXHIBIT "A"

[Arbitration Award dated June 26, 2020]

## JAMS ARBITRATION NO. 1425031204

GREENWICH QUANTITATIVE RESEARCH LP,

                          Claimant,

      -against-

MICHAEL AKSMAN,

                          Respondent.

### FINAL ARBITRATION AWARD

The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement set forth in a Restrictive Covenants Agreement, dated March 7, 2019 ("Agreement"), between Claimant Greenwich Quantitative Research LP ("Greenwich") and Respondent Michael Aksman ("Aksman"), hereby issues the following Final Arbitration Award.

I.    <u>Introduction</u>

Greenwich is a Delaware asset management firm that specializes in the trading of global equities. In 2017, Greenwich hired Aksman to be the Senior Portfolio Manager for a newly-created fund. Greenwich hired Aksman based on representations that he had made concerning his past trading success that turned out to be fraudulent.

In this proceeding, Greenwich seeks to recover the damages it sustained as a result of Aksman's misrepresentations. Greenwich's factual assertions concerning Aksman's misconduct are essentially uncontradicted because Aksman has refused to participate in the arbitration despite having received repeated notice of its pendency.

II.     Procedural History

The Agreement provides that its terms "shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions thereof." (Agreement § 8(a)). In the Agreement, Aksman further agreed that, in consideration of his employment, "any and all controversies, claims, or disputes with anyone (including [Greenwich] and any employee, officer, director, stockholder or benefit plan of [Greenwich] . . . ) arising out of, relating to, or resulting from [his] employment with [Greenwich]  or the termination of [his] employment with [Greenwich], including any breach of th[e] Agreement, shall be subject to binding arbitration" at JAMS, pursuant to the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), "before a sole arbitrator who shall be a lawyer." Id. § 8(b)(i), (ii) (block capitalization omitted). Finally, the Agreement provides that the decision of the arbitrator shall be binding upon Aksman. Id. § (b)(ii).

On or about November 8, 2019, Greenwich submitted to JAMS a Demand for Arbitration ("Demand") in which it detailed its claims against Aksman. Greenwich sought approximately ten million dollars in damages by reason of Aksman's alleged fraud.

On November 8, 2019, Greenwich's counsel, Serine Consolino, Esq., notified Aksman of the pendency of this proceeding by emailing a copy of the Demand to him at his email address, maksman123@gmail.com, and sending a second copy by Federal Express to his residence, 8 Kent Place, North Plainfield, New Jersey 07063. Ms. Consolino received no response to the email and the Federal Express package was returned to her.

Thereafter, on January 16, 2020, Kenneth Cummings ("Cummings") effected personal service on Aksman in two different ways. First, Cummings served a woman at Aksman's residence in North Plainfield, New Jersey. At the time of service, there was a vehicle

2

in the driveway, which Cummings determined was registered to Maria T. Platt-Aksman, presumably Aksman's wife. Second, a little while later, Cummings saw the same vehicle at a stop sign near Aksman's house. The vehicle was being driven by the woman whom he previously had served; based on photographs that he had viewed on social media, Cummings determined that Aksman was the passenger. After Cummings walked to the passenger side of the vehicle, Aksman lowered his window partially, but when Cummings attempted to serve him, Aksman pushed the papers back out of the window. The vehicle then drove away.

On January 15, 2020 (the day before Cummings effected personal service on Aksman), I held a preliminary telephone conference in this matter. I set March 16, 2020, as the deadline to complete discovery and April 16, 2020, as the date for the evidentiary hearing. Aksman received advance notice of the preliminary conference via email on January 13, 2020, and was sent a copy of the order resulting from the conference. Aksman did not respond to either of these communications.

Due to the COVID-19 pandemic, the hearing could not be held as scheduled in person. Accordingly, I determined that it would be held via a Zoom teleconference. Rule 22(g) of the JAMS Rules expressly permits the Arbitrator to require that a hearing or any portion thereof be held in that manner. To discuss the logistics of the virtual hearing, I held an additional telephone conference on April 8, 2020. Aksman received email notice of that conference but did not attend.

Following the April 8 conference, I issued an order explaining why the hearing in this matter would be held via teleconference. Aksman received a copy of this order by email but did not respond. Aksman also received an emailed notice of the Zoom hearing but did not appear.

3

During the hearing, only one witness testified:  Gene Reilly ("Reilly"),

Greenwich's Chief Investment Officer.  In addition, Greenwich introduced in support of its claim

nearly ninety exhibits and the declarations of Sean Trager ("Trager") and Paul C. Rauser, Esq.

Following the hearing, I issued an order directing that post-hearing submissions

be made by May 1, 2020.  Aksman received a copy of that order via email but has not made any

submission to the Arbitrator.  Greenwich's post-hearing submission, on the other hand, was

timely received.

JAMS Rule 24(a) provides for an award to be issued within thirty days after the

hearing is closed.  Since I received the Claimant's post-hearing submissions on May 1, 2020, the

award originally was due on June 3, 2020.  Owing to the press of business, I requested a thirty-

day extension of that deadline.  Greenwich consented, and Aksman did not oppose the request,

despite having received email notice of it.  This Final Arbitration Award is therefore timely.

III.    Relevant Facts

The uncontradicted evidence establishes as follows:

Greenwich's sole witness, Reilly, has had a lengthy career in the financial

services industry, in the course of which he served as a partner at Goldman Sachs, where he

managed Pan-Asian equity trading, and oversaw global quantitative trading for Merrill Lynch.

In 2017, he founded Greenwich to provide market neutral quantitative investment products for

institutional clients, such as pension and hedge funds and endowments.  He anticipated launching

the fund in late 2019.

One of the first steps that Reilly pursued was to hire a Senior Portfolio Manager

for the fund.  Through a recruiter, he located Aksman, whose résumé indicated that he had a

master's degree in Computational Mathematics from MIT and a PhD in Theoretical Physics from

4

the Soviet Academy of Sciences. The résumé also reflected substantial experience trading equities. Aksman represented to Reilly that he was managing a $10 million personal equity account housed at Wedbush Securities on behalf of Stefano Brocco, a partner at A.R.T. Advisors, a well-regarded quantitative investment firm in New York. During the interview process, Aksman gave Reilly purported Wedbush Equity Summary Reports, which suggested that he was trading Brocco's managed account very successfully. Aksman further represented that the reports were Wedbush documents.

Aksman also provided copies of his personal tax returns which seemed consistent with the earnings that he would have been likely to receive for managing Brocco's account. Although Aksman was unable to provided audited financials for the Wedbush account, he stated that this was because his investment advisory agreement with Brocco precluded such disclosure, which seemed plausible at the time.

After verifying Aksman's prior employment, and checking to make sure that the income on his tax returns was consistent with the terms of his alleged arrangement with Brocco, Greenwich hired Aksman as a portfolio manager. At that time, Aksman signed a Restrictive Covenants Agreement, dated October 24, 2017, which contained language concerning arbitration identical to the language of the Agreement that Aksman later signed in 2019. Although the counterparty on the 2017 agreement was Greenwich Quantitative Research LLC, the agreement applied not only to that company, but also to any of its affiliates.

After he was hired, Aksman provided Greenwich with monthly updates concerning his alleged trading for the Brocco account. In addition, he repeatedly verified the authenticity of that account in communications with Reilly and other Greenwich employees. Greenwich, in turn, used the performance of the Brocco account to create simulated account

5

information that it used to tout Aksman's trading success to potential investors in its fund.  Over time, Greenwich made representations concerning Aksman's purported trading activities to approximately seventy such institutional investors. Among other statements, Greenwich represented that the simulated results were based on an actual account managed by Aksman. Aksman himself also filled out a questionnaire from a potential investor in which he represented that "We daily compare our PNL with broker reports," thereby confirming that he was engaged in actual trading.  He similarly responded to many other questions concerning his trading using the present tense.

At times, Aksman also participated directly in efforts to solicit funds from investors for the Greenwich portfolio that he would manage.  During many of those meetings, he represented to potential investors that he was actively managing an account at Wedbush. Indeed, during one such meeting, in July 2019, he told representatives of Morgan Stanley Alternative Investment Partners details about the account that he allegedly was managing for Brocco at A.R.T. Advisors.  During another meeting with a prominent investment consultant retained by the Texas Teachers Retirement System, Aksman confirmed that he was applying his trading strategies to a live managed account.  The consultant in turn sent a report that discussed Aksman's alleged trading to hundreds of pension funds, sovereign wealth funds, and endowments, including several prospective investors in the Greenwich fund.  In that report, the consultant noted that Greenwich had hired one portfolio manager who was "already trading the strategy live in a managed account."

During the summer of 2019, Greenwich retained James Alpha, an investment advisor, to assist in its efforts to market the new fund. James Alpha then decided to establish an account for one of its clients that Greenwich would trade so that it could generate an audited

track record of Aksman's performance.  Because of Aksman's alleged trading for Brocco, James Alpha opted to use Wedbush as the prime broker for that account.

When Reilly and representatives of James Alpha placed a telephone call to Wedbush to establish the account, Trager, a Wedbush vice president, requested certain trading parameters so that he could prepare a price quote.  After Reilly suggested that he simply use the parameters for Aksman's existing Wedbush account, Trager responded that he could not locate such an account on Wedbush's system.

Over the next few weeks, Aksman sought to cover his tracks.  First, he insisted that Trager was simply mistaken.  Then, he suggested that Trager might be prohibited from discussing the details of Wedbush customer accounts.  On September 23, 2019, however, Greenwich obtained from James Alpha a copy of an email exchange in which Trager unambiguously informed Aksman:  "You know full well there is 'no active account [at Wedbush] and that more specifically there is no cash on deposit or positions."

As his scheme was coming undone, Aksman made various inconsistent statements regarding the alleged Brocco account.  On September 25, 2019, he stated in an email to Reilly that "Stefano got wind of [the] controversy and closed the account recently."  Subsequently, during a conference call with Reilly and others on October 3, 2019, Aksman said that the account had been closed more than one year earlier.  In an October 12, 2019 email, Aksman said that the account was closed at the end of 2018.

Aksman also declined Reilly's request that he provide official tax return transcripts that could have helped verify Aksman's claims concerning the income he allegedly had received for trading the Brocco account.

In truth, as Trager subsequently explained in a declaration, neither Aksman nor his company had managed any equity account at Wedbush over the preceding five years. Greenwich, of course, would not have hired Aksman as a portfolio manager had it known that his representations regarding the Brocco account were false.

IV.    Discussion

    A.    Personal Jurisdiction

Since Aksman has not appeared, some discussion of the manner in which he was served is warranted.

For service of process to be effective, it must satisfy the due process requirements of the Fourteenth Amendment, which means that the defendant be given adequate notice of the claims being made against him. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313-14 (1950). Additionally, at least when service is made in connection with a judicial proceeding, there must be a statutory basis for the form of service that is made.

Here, the Agreement giving rise to this arbitration states that Delaware law applies. Under Delaware law, service of process on an individual may be made in any manner that is permissible under the laws of the state where service is made for actions in its courts of general jurisdiction. See Del. Code Ann. tit. 10, § 3104(d)(2). The efficacy of service upon Aksman therefore is appropriately determined using New Jersey law.

Section 4:4-4(a) of the New Jersey Rules of Court provides that service of process may be effected upon an individual either by serving him personally or by leaving a copy of the summons and complaint at the individual's usual dwelling place or place of abode with a competent member of the household over the age of fourteen then residing there. There seems to be little doubt that the service of the Demand in this case satisfies both alternative means since

8

(i) a woman, presumably Aksman's wife, accepted a copy at his residence, and (ii) he himself was given a copy only a little while later, although he pushed the papers out of the vehicle in which he was riding before he was driven away.

Moreover, Aksman also received a copy of the Demand from counsel via email and there is no indication that he had abandoned his email address by the time it was sent. Indeed, since the initial service of the Demand, Aksman has repeatedly received emails from JAMS concerning procedural aspects of this case, none of which bounced back as undeliverable.

In these circumstances, it is clear that Aksman has received sufficient notice of the Demand and the relief that Greenwich is seeking.

     **B.**    <u>Fraud</u>

Under Delaware law, a party seeking to establish a claim of fraudulent misrepresentation must show: **"**(1) that the defendant made a false representation of a material fact to the plaintiff; (2) that the defendant [had] . . . knowledge of the falsity of the representation, while the plaintiff [was] . . . ignorant of the falsity; (3) that the misrepresentation was made with the intent that the plaintiff would believe it to be true, act in reliance thereon, and be deceived thereby; and (4) that the plaintiff actually did so believe, act, and was deceived, as well as having been harmed thereby.**"** <u>Lechliter v. Del. Dep't of Nat. Res. & Envtl. Control</u>, No. 7939-VCG, 2015 WL 9591587, at *18 (Del.Ch. Dec. 31, 2015). Here, it frankly would be difficult to conceive of a fraud more blatant than the one that Aksman perpetrated upon Greenwich.

Turning to each of the required elements of Greenwich's claim, it is clear that Greenwich has made the showing necessary to recover damages for fraud. First, as Trager's declaration alone establishes, the repeated statements that Aksman made to Greenwich and

9

others concerning his trading of an equities account at Wedbush for Brocco were a complete

fabrication.  Moreover, these false statements obviously were material since they induced

Greenwich to hire Aksman as a portfolio manager.  Second, Aksman unquestionably must have

known that his statements were false since he eventually conceded that he had not been

managing an account for Brocco at Wedbush at the time they were made.  Although Greenwich

undertook efforts to verify Aksman's representations, it also is apparent that the firm was

unaware of the fraud since someone of Reilly's stature in the investment community would not

have attempted to market a fund based on Aksman's alleged trading prowess had he known the

truth.  Third, it is clear that Aksman lied to Greenwich simply so that the firm would give him a

job – and other benefits  –  for which he otherwise would have been ineligible.  Finally, because

Greenwich spent considerable sums to launch the fund that Aksman had been retained to

spearhead, there can be no question that Greenwich's reliance on Aksman's misrepresentations

has caused it considerable financial harm.

For these reasons, Greenwich is entitled to recover on its fraud claim.

C.     Damages

1.     Compensatory Damages

In Stephenson v. Capano Development Corp, Inc., 462 A.2d 1069, 1076 (Del.

1983), the Delaware Supreme Court explained that "Delaware law recognizes two measures of

damages . . . in cases of fraud or deceit."  The more common "benefit of the bargain" standard

"put[s] the plaintiff in the same financial position that he would have been in if the defendant's

representations had been true."  Id.  The other (less frequently invoked) "out-of-pocket measure"

"is designed to restore the plaintiff to his financial position before the transaction occurred."  Id.

Here, Greenwich seeks the benefit of its bargain with Aksman. In that regard, Greenwich maintains that it had a $150 commitment from a large state pension fund which, but for Aksman's fraud, would have permitted it to launch its fund. Additionally, based on its discussions with other potential investors, including a large sovereign wealth fund, and the fact that it had received a favorable review from a prestigious consulting firm, Greenwich expected to have $375 million in assets under management by the end of its first year of operation. Applying the financial terms that it had been negotiating with the large pension fund, and assuming that its other investors would have received similarly beneficial treatment, Greenwich concludes that it would have realized net income of $3,087,480 during its first year of operation and $4,209,994 during its second year of operation. (The calculations underlying this contention are based on exhibits received in evidence and are set forth in a demonstrative exhibit which I will deem marked as Claimant's Exhibit 90.) In arriving at these numbers, Greenwich used the average 11.4 percent return of six comparable funds to calculate the incentive fee it likely would have earned. Greenwich notes that this is a lower rate of return than Aksman himself estimated the fund was likely to achieve.

According to Reilly, as a consequence of Aksman's fraud, Greenwich may not be able to launch the fund it intended to have Aksman manage. In any event, even if Greenwich can overcome the marketing and disclosure challenges arising out of Aksman's misconduct, Greenwich will have lost approximately one year of activity before it can begin operations.

Greenwich's calculations of its damages are based on a number of assumptions. Among other things, Greenwich assumes that investors other than the sovereign wealth fund would have followed through on their expressions of interest, and that the fund would have

Case 1:20-cv-08045-PAE   Document 1-1   Filed 09/29/20   Page 31 of 67

achieved a relatively high rate of return notwithstanding the somewhat chaotic conditions that the financial markets have been experiencing during the COVID-19 pandemic.

Nevertheless, under Delaware law, when a claimant has established "the fact of damages," "less certainty is required of the proof establishing the amount of damages," which "can be an estimate." SIGA Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1131-32 (Del. 2015) (emphasis omitted).  Additionally, the mere fact that a business is a startup does not preclude an award of lost profits.  See Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., 1985 WL 189018, at *4 (Del. Super. Ct. July 29, 1985) ("Lost profits on a new business may be too speculative to allow recovery if there is no evidence that the business would be profitable, but recovery for lost profits is not denied merely because a business is newly established.") (internal citation omitted).

In the absence of any evidence to suggest that Greenwich would not have launched a fund that would have had $375 million in assets under management by the end of its first year, or that it would not have achieved at least the average rate of return of six comparable funds, I find that Greenwich's estimate of the profits it has lost through at least a year of delay attributable to Aksman's fraud is reasonable.  Greenwich is therefore entitled to recover lost profits in the amount of $3,087,480.

Greenwich also seeks to recover its legal fees.  "[U]nder the prevailing 'American Rule,' courts generally do not award attorney's fees to a prevailing party unless some special circumstance is present."  Barrows v. Bowen, No. 1454-S, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994).  Here, however, the Agreement between Greenwich and Aksman expressly provides that the Arbitrator "shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law."  In that regard, the Delaware courts have held

12

that "there are those cases in which attorney's fees are awarded against a defendant . . . because the action giving rise to the suit involved bad faith, fraud, conduct that was totally unjustified, or the like and attorney's fees are considered an appropriate part of damages. Id. (internal quotation marks omitted).

This obviously is such an exceptional case. Aksman lied to Greenwich repeatedly in an effort to obtain benefits to which he otherwise would not have been entitled. Greenwich is therefore entitled to recover its reasonable provable legal fees so that it can be restored to the situation in which it would have found itself had Aksman's representations been true. Through Mr. Rauser's declaration, Greenwich has shown that it paid $174,707 to its litigation counsel and their experts (including the process server) through March 31, 2020, in an effort to remediate the effects of Aksman's fraud. These fees and costs are recoverable.

In addition, Greenwich seeks to recover an estimated $75,000 for its attorneys' services in connection with the arbitral hearing and other work-in-progress. Although there is no question that Greenwich has incurred additional legal expenses since March 31, this guesstimate is an insufficient basis upon which to award fees. The latter request is therefore denied.

Finally, Rule 24(f) of the JAMS Rules affords the arbitrator the discretion to "allocate the Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement." Here, the Agreement between the parties contains no such limitation. Accordingly, Greenwich will be awarded Arbitration fees and expenses, including Arbitrator compensation, in the amount of $18,795.58.

Thus, Greenwich will be awarded total compensatory damages in the amount of $3,280,982.58 ($3,087,480 + $174,707 +$18,795.58).

2.    Punitive Damages

"[C]ompensatory damages attempt to make the plaintiff whole . . . , while punitive damages operate to punish the individual defendant and deter similar conduct by others." Stephenson, 462 A.2d at 1077 (internal citations omitted). Such punitive damages are appropriate where the fraud is "gross, oppressive, or aggravated, or where it involves breach of trust or confidence." Id. at 1076.

As I suggested during the hearing, although punitive damages are rarely awarded, this case involves conduct so egregious that the damages award must address the need for deterrence and punishment. Greenwich seeks an award of $3 million in punitive damages, but there is no indication that Aksman is someone with substantial ix```ndependent means. Accordingly, notwithstanding the brazenness of his conduct, I will limit the punitive damages aspect of the award to $750,000.

3.    Post-Award Interest

Greenwich also seeks to recover pre- and post-award interest until Aksman has satisfied the award.

Rule 24(g) of the JAMS Rules provides that an Arbitrator "may allocate . . . interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law." The Agreement is silent with respect to an award of interest. Accordingly, if interest is to be awarded, the source of the Arbitrator's authority to do so must be Delaware law.

In Duffy v. Cook, No. 16307-NC, 1998 WL 914267, at *3 (Del. Ch. Dec. 22, 1998), the court declined to modify an award to include post-award interest that had not been granted by the arbitral panel. In doing so, the court recognized that a rule requiring a non-

14

prevailing party to pay post-award interest would encourage timely payment of an award, but explained that "the issues involved in considering whether or not to adopt such a rule and, if so, what rule to adopt, should either be addressed by the parties in structuring the terms of their arbitration agreement, by the General Assembly by way of amendment to the [Delaware Uniform Arbitration Act], or, in cases where the agreement to arbitrate is entered into as part of a court-sponsored alternative dispute resolution mechanism, by rule of that court.

Greenwich has failed to point to any provision of Delaware law that authorizes the imposition of either pre-award, or post-award/prejudgment interest in the absence of an express agreement by the parties to that effect. Accordingly, because the Agreement also is silent in this regard, I respectfully decline to award Greenwich any pre- or post-award interest.

## V. Award

For the foregoing reasons, respondent Michael Aksman is directed to pay claimant Greenwich Quantitative Research LP, within ten days, the sum of $4,030,982.58, consisting of lost profits in the amount of $3,087,480, punitive damages in the amount of $750.000, legal fees and expenses in the amount of **$174,707, and arbitration fees and arbitrator compensation and expenses in the amount of $18,795.58.**

SO ORDERED.

Dated:       New York, New York
             June 26, 2020

**Frank Maas**
**Arbitrator**

15

I, Frank Maas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

June 26, 2020

_____
Frank Maas
Arbitrator

### PROOF OF SERVICE BY E-Mail

Re: Greenwich Quantitative Research LP vs. Aksman, Michael
Reference No. 1425031204

I, Shakiya Wright-McDuffie, not a party to the within action, hereby declare that on July 14, 2020, I

served the attached Final Award on the parties in the within action by electronic mail at New York, NEW

YORK, addressed as follows:

Mr. Paul C. Rauser                                  Mr., Michael Aksman
Serine Consolino Esq.                               8 Kent Place
Aegis Law Group LLP                                 North Plainfield, NJ   07063
801 Pennsylvania Ave., N.W.                         Phone: 732-983-1086
Suite 740                                           maksman123@gmail.com
Washington, DC   20004                                Parties Represented:
Phone: 202-737-3500                                   Michael Aksman
prauser@aegislawgroup.com
sconsolino@aegislawgroup.com
  Parties Represented:
  Greenwich Quantitative Research LP

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on July 14, 2020.

_____
Shakiya Wright-McDuffie
JAMS
swrightmcduffie@jamsadr.com

# EXHIBIT "B"

[Restrictive Covenants Agreement dated March 7, 2019]

Restrictive Covenants Agreement

This Restrictive Covenants Agreement (the "Agreement"), is made as of the 7th day of March, 2019, between Greenwich Quantitative Research LP and the employee signatory hereto ("Employee").

R E C I T A L S:

WHEREAS, Employee acknowledges and recognizes the highly competitive nature of the businesses of Greenwich Quantitative Research LP and its affiliates (collectively, the "Company");

WHEREAS, Employee and the Company entered into an original Restricted Covenants Agreement dated as of October 24, 2017 (the "Original Agreement") and the parties wish to amend and restate the original agreement in its entirety;

WHEREAS, Employee acknowledges that he or she will be provided with access to sensitive, proprietary and confidential information of the Company and will be provided with the opportunity to develop relationships with clients, prospective clients, employees, vendors, suppliers and agents of the Company, which, in each case, Employee acknowledges and agrees constitute valuable assets of the Company; and

WHEREAS, Employee agrees to be subject to the restrictive covenants as set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the parties agree as follows:

1.      Confidentiality.

(a)      Employee will not at any time (whether during or after Employee's employment with the Company), other than in the ordinary course of performing services for the Company, (x) retain or use for the benefit, purposes or account of Employee or any other person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"); or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information obtained by Employee in connection with the commencement of Employee's employment with the Company or at any time thereafter during the course of Employee's employment with the Company — including, without limitation, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals — concerning the past, current or future business activities and operations of the Company and/or any third party that has disclosed or provided any of the same to the Company on a confidential basis (provided that with respect to such third party, Employee knows or reasonably should have known that the third party provided it to the Company on a confidential

basis) ("Confidential Information") without the prior written authorization of the Chief Investment Officer of Greenwich Quantitative Research LP; provided, however, that in any event Employee shall be permitted to disclose any Confidential Information reasonably necessary (i) to perform Employee's duties while employed with the Company or (ii) in connection with any litigation or arbitration involving this or any other agreement entered into between Employee and the Company before, on or after the date of this Agreement in connection with any action or proceeding in respect thereof.

(b)       Confidential Information shall not include any information that is (x) generally known to the industry or the public other than as a result of Employee's breach of this covenant or any breach of other confidentiality obligations by third parties to the extent Employee knows or reasonably should have known of such breach by such third parties (unless the Employee's further disclosure of such Confidential Information would have no further impact on the Company); (y) made available to Employee by a third party (unless Employee knows or reasonably should have known that such third party has breached any confidentiality obligation); or (z) required by law or by any court, arbitrator, mediator or administrative or legislative body (including any committee thereof) with actual or apparent jurisdiction to order Employee to disclose or make accessible any information; provided that, with respect to clause (z) Employee, except as otherwise prohibited by law or regulation, shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and shall reasonably cooperate with any attempts by the Company, at its sole cost, to obtain a protective order or similar treatment prior to making such disclosure.

(c)       Except as required by law or otherwise set forth in clause (z) of Section 1(b) above, or unless or until publicly disclosed by the Company, Employee will not disclose to anyone (including, without limitation, to other employees or service providers of the Company), other than Employee's immediate family and legal, tax or financial advisors, the existence or contents of this Agreement or any aspect of the compensation or benefits offered, paid, payable or provided to him by the Company or any equity ownership or similar incentive opportunities offered to him by the Company; provided that (i) Employee may disclose the provisions of this Agreement to any prospective future employer provided such future employer agrees to maintain the confidentiality of such terms, (ii) Employee may disclose the provisions of this Agreement in connection with any litigation or arbitration involving this Agreement, and (iii) Employee may disclose his compensation and benefits in connection with any litigation or arbitration involving his compensation and benefits.

(d)       Upon termination of Employee's employment with the Company for any reason, Employee shall (x) cease and not thereafter commence use of any Confidential Information or intellectual property (including, without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) if such property is owned or used by the Company (other than such property that is generally available for public use and is not owned by or otherwise proprietary to the Company); (y) immediately destroy, delete, or return to the Company, at the Company's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Employee's possession or control (including any of the foregoing stored or located in Employee's office, home, laptop or other computer, whether or not Company property) that contain Confidential Information or otherwise relate to the business of the Company, except that

Employee may retain only those portions of any personal notes, notebooks and diaries that do not contain Confidential Information; and (z) notify and fully cooperate with the Company regarding the delivery or destruction of any other Confidential Information of which Employee is or becomes aware to the extent that such information is in Employee's possession or control. Notwithstanding anything elsewhere to the contrary, Employee shall be entitled to retain (and not destroy) (x) information showing Employee's compensation, relating to his ownership of equity of the Company or relating to reimbursement of expenses that Employee reasonably believes is necessary for tax purposes and (y) copies of plans, programs, policies and arrangements of, or other agreements with, the Company addressing Employee's compensation, Employee's ownership of equity of the Company or Employee's employment or termination thereof.

  2.  Non-Competition.

  (a)  Employee acknowledges and agrees that the Company and its business would be irreparably damaged if Employee (or, if applicable, any of Employee's controlled affiliates) were to provide services to any Person (including Employee) engaged in a Restricted Business (as defined below) and that such competition by Employee (or, if applicable, any of Employee's controlled affiliates) would result in a significant loss of goodwill by the Company. Therefore, Employee agrees that (a) during the period of Employee's employment with the Company, Employee shall pursue all appropriate business opportunities of the Company exclusively through the Company and (b) during the period of Employee's employment with the Company and for twelve (12) months following the cessation of such employment for any reason, or such shorter period as may be determined by the Company in its discretion at the time of Employee's cessation of employment (the "Non-Competition Period"), Employee shall not (and, as applicable, shall cause each of Employee's controlled affiliates not to) directly or indirectly through another Person own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, advisor, individual independent contractor, consultant, representative or otherwise), consult with, represent, render services for, or in any other manner engage in the Restricted Business in any market in the United States, Japan, China, or in any other market in which Employee was involved on behalf of the Company; provided, that nothing herein shall prohibit Employee (and any of Employee's controlled affiliates, as applicable) from being a passive owner of not more than two percent (2%) of the outstanding stock of any class of a corporation or entity which is publicly traded so long as Employee (or any of Employee's controlled affiliates, if applicable) does not have any active participation in the management or other business of such corporation or entity. In the event Employee's employment with the Company ceases for any reason, Employee shall continue to be paid Employee's base salary for the duration of the Non-Competition Period. As used herein, the term "Restricted Business" means collectively (x) any business involved in quantitative trading, including, without limitation, the quantitative trading of global equities, or trading rates/fixed income, commodities or foreign exchange asset classes, or (y) any business or businesses of a type not described in clause (x) in which Employee was actively engaged on behalf of the Company during the preceding twelve (12) month period prior to the date on which Employee ceases to be employed with the Company (and any logical extensions thereof).

  (b)  Through and up to the conclusion of the Non-Competition Period, Employee shall give notice to the Company of each new business activity he plans to undertake, at least seven (7) days prior to beginning any such activity. Without limiting the foregoing, Employee agrees

to deliver to the Company notice of his subsequent employer, as well as his business relationship(s) and position(s) with such subsequent employer, in connection with his notice of resignation from employment or, if applicable, in connection with any other termination of Employee's employment. Any notice delivered pursuant to this Section 2(b) shall state the name and address of the Person for whom such new business activity is undertaken and the nature of Employee's business relationship(s) and position(s) with such Person. Employee shall provide the Company with such other pertinent information concerning such business activity as the Company may reasonably request in order to determine the Executive's continued compliance with his obligations under this Agreement.

(c)     Through and up to the conclusion of any period during which Employee is subject to any restrictions or obligations hereunder (including, without limitation, the noncompetition provisions in this Section 2), Employee shall give timely notice to his subsequent employer, or any other relevant Person in connection with any new business activity he plans to undertake, of such restrictions and obligations, and the Company reserves the right to deliver notice of such restrictions and obligations to such party as well.

3.      Non-Solicitation; Non-Interference; Non-Disparagement.

(a)     Without limiting any duty or obligation otherwise applicable to Employee, Employee agrees as follows:

(i)     <u>Non-Solicitation of Clients</u>.  During the period of Employee's employment with the Company and for twelve (12) months following the cessation of such employment (collectively, the "Restricted Period"), Employee will not, whether on Employee's own behalf or on behalf of or in conjunction with any Person, directly or indirectly solicit or assist in soliciting the business of, any investment from, any opportunity to make an investment in, or any opportunity to act as a market maker or in algorithmic trading, quantitative research, trading system, algorithmic developing or designing, trade execution or proprietary trading business, or as an asset management advisor in connection with any transaction involving any broker-dealer, client, prospective client, investor, portfolio company or prospective portfolio company, or member of management of any portfolio company or prospective portfolio company of the Company (collectively, the "Clients"):

(A)     with whom Employee had personal contact or dealings on behalf of the Company during the two-year period immediately preceding the Relevant Date;

(B)     with whom employees reporting to Employee have had personal contact or dealings on behalf of the Company during the two-year period immediately preceding the Relevant Date; or

(C)     with respect to which Employee had direct or indirect responsibility during the two-year period immediately preceding the Relevant Date.

(iii)    <u>Non-Interference with Business Relationships</u>.  During the Restricted Period, Employee will not interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the Company, on the

one hand, and any Clients, customers, suppliers, distributors, vendors, service providers, licensors, licensees, or partners of the Company, on the other hand.

(iv)    <u>Non-Solicitation of Employees; Non-Solicitation of Consultants</u>.  During the Restricted Period, Employee will not, whether on Employee's own behalf or on behalf of or in conjunction with any Person, directly or indirectly (other than in the ordinary course of Employee's employment with the Company and on the Company's behalf):

(A)    solicit or encourage any employee of the Company to leave the employment of the Company;

(B)    hire any such employee who was employed by the Company as of the date of Employee's termination of employment with the Company or who left the employment of the Company coincident with, or within six months prior to or after, the termination of Employee's employment with the Company; or

(C)    solicit or encourage to cease to work with the Company any consultant that Employee knows, or reasonably should have known, is then under contract with the Company.

(v)    During the period of Employee's employment with the Company and at any time following the cessation of such employment for any reason, Employee shall not (and, if applicable, shall cause each of Employee's controlled Affiliates not to) defame or disparage the Company in any medium to any Person.  Notwithstanding the foregoing, Employee (and Employee's controlled Affiliates, if applicable) may confer in confidence with Employee's (or, if applicable, Employee's controlled Affiliate's) legal representatives and make truthful statements as are required by applicable law or legal process.

(b)    It is expressly understood and agreed that although Employee and the Company consider the restrictions contained in this Agreement to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against Employee, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable (provided that in no event shall any such amendment broaden the time period or scope of any restriction herein).  Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

(c)    For purposes of this Agreement, "Relevant Date" shall mean, when applied during the term of Employee's service with the Company, the date of such application and, when applied following Employee's cessation of service with the Company, the effective date of that cessation of service.

4.    Intellectual Property.

Case 1:20-cv-08045-PAE   Document 1-1   Filed 09/29/20   Page 43 of 67

(a)      If Employee has created, invented, designed, developed, contributed to or improved any inventions, intellectual property, discoveries, copyrightable subject matters or other similar work of intellectual property (including, without limitation, research, reports, software, databases, systems or applications, presentations, textual works, content or audiovisual materials) ("Works"), either alone or with third parties, during Employee's employment prior hereto, that are relevant to or implicated by such employment ("Prior Works"), to the extent Employee has retained or does retain any right in such Prior Works, Employee hereby grants the Company a perpetual, non-exclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) therein to the extent of Employee's rights in such Prior Works for all purposes in connection with the Company's current and future business.

(b)      If Employee creates, invents, designs, develops, contributes to or improves any Works, either alone or with third parties, at any time during Employee's employment by the Company and within the scope of such employment and/or with the use of any the Company resources ("Company Works"), Employee acknowledges and agrees that the Company Works constitute "works made for hire" under the copyright laws of the United States and Employee shall promptly and fully disclose same to the Company and hereby irrevocably assigns, transfers and conveys, to the maximum extent permitted by applicable law, and at the Company's sole expense, all rights and intellectual property rights therein (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) to the Company to the extent that ownership of any such rights does not vest originally in the Company.

(c)      Employee agrees to keep and maintain adequate and current written records (in the form of notes, sketches, drawings, and any other form or media requested by the Company) of all Company Works.  The records will be available to and remain the sole property and intellectual property of the Company at all times.

(d)      Employee shall take all requested actions and execute all requested documents (including any licenses or assignments required by a government contract) at the Company's sole expense (but without further remuneration) to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Prior Works and Company Works as set forth in this Section 4.  If the Company is unable for any other reason to secure Employee's signature on any document for this purpose, then Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact to act for and on Employee's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(e)      Except as may otherwise be required under Section 4(a) above, Employee shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party which Employee knows or reasonably should have known is confidential, proprietary or non-public information or intellectual property of such third party without the prior written

permission of such third party.  Employee shall comply with all relevant policies and guidelines of the Company, including regarding the protection of Confidential Information and intellectual property and potential conflicts of interest.  Employee acknowledges that the Company may amend any such policies and guidelines from time to time, and that Employee remains at all times bound by their most current version made available to employees of the Company generally.

(f)     The provisions of this Section 4 shall survive the termination of Employee's employment for any reason; provided that Employee's obligation to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Prior Works and Company Works pursuant to Section 4(d) shall terminate upon the later of termination of Employee's employment or upon the end of any termination notice period set forth in any other agreement entered into between Employee and the Company before, on or after the date of this Agreement.

5.     Notice of Termination.

(a)     Employee agrees to provide the Company with advance written notice of any resignation of his or her employment of a period no less than 90 days; provided, however, that the Company may in its discretion waive all or part of the applicable notice period.

(b)     During the notice period described above in Section 5(a), the Company may in its discretion require Employee to cease performing some or all of his or her duties and to refrain from entering its places of business; provided that during such notice period, Employee will remain a Company employee, will cooperate reasonably in the transition of his or her duties to other the Company personnel and will remain bound by all of his or her duties and obligations to the Company, including (without limitation) the obligations stated in this Agreement and the duties and obligations applicable to Employee under common law.

6.     Cooperation.

During the period of Employee's employment with the Company and at any time following the cessation of such employment for any reason, Employee agrees to cooperate (i) with the Company in the defense of any legal matter involving any matter that arose during Employee's employment with the Company and (ii) with all governmental authorities on matters pertaining to any investigation, litigation or administrative proceeding pertaining to the Company.  The Company will reimburse Employee for any reasonable travel and out-of-pocket expenses incurred by Employee in providing such cooperation.  Furthermore, any such cooperation occurring after the termination of Employee's employment shall be scheduled to the extent reasonably practicable so as not to unreasonably interfere with Employee's business or personal affairs.

7.     Specific Performance.

Employee acknowledges and agrees that in the course of Employee's service to the Company, Employee will be provided with access to Confidential Information, and will be provided with the opportunity to develop relationships with Clients, employees and other agents of the Company, and Employee further acknowledges that such Confidential Information and

relationships are extremely valuable assets of the Company in which the Company has invested and will continue to invest substantial time, effort and expense.  Accordingly, Employee acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Sections 1, 2, 3, 4 and 5 would be inadequate and, in recognition of this fact, Employee agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to cease making any payments or providing any benefit otherwise required to be paid or provided by the Company (other than any vested benefits under any retirement plan or as may be required by applicable law to be provided), enforce any forfeiture provision applicable to outstanding equity awards, as provided in the applicable award agreements, and seek equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available; provided, however, that if (x) with respect to a threatened breach, Employee recants and fully withdraws such threat and does not actually breach any such provisions or (y) it is subsequently determined in a final and binding arbitration or litigation that Employee did not breach any such provision, the Company will promptly pay any payments or provide any benefits which the Company may have ceased to pay when originally due and payable, plus an additional amount equal to interest (calculated based on the applicable federal rate for the month in which such final determination is made) accrued on the applicable payment or the amount of the benefit, as applicable, beginning from the date such payment or benefit was originally due and payable through the day preceding the date on which such payment or benefit is ultimately paid hereunder.

8.    Miscellaneous.

(a)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions thereof.

(b)    <u>Arbitration</u>.

(i)    In consideration of Employee's employment or engagement with the Company, his promise to arbitrate all employment or service related disputes and Employee's receipt of the compensation and other benefits paid to Employee by the Company, at present and in the future, EMPLOYEE AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, STOCKHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. Employee agrees to arbitrate such disputes, and thereby agrees to waive any right to a trial by jury, including any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the New York State Labor Law, claims of harassment, discrimination or wrongful termination and any statutory claims.  Employee further understands that this agreement to arbitrate also applies to any disputes that the Company may have with Employee.

-8-

(ii)     Employee agrees that any arbitration will be administered by Judicial Arbitration & Mediation Services ("JAMS"), or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures and JAMS appellate procedures (such rules and procedures, the "Procedure") before a sole arbitrator who shall be a lawyer.  Employee agrees that the arbitration will be conducted in New York, New York.  Employee agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing.  Employee also agrees that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law and that any decision or judgment of the arbitrator will be enforceable in any court of competent jurisdiction. Employee agrees that the decision of the arbitrator shall be in writing and shall be binding upon Employee and the Company.

(iii)     Except as provided by the Procedure and this Agreement (including, without limitation, Section 7 hereof) or any other agreement, plan or written policy to which you may be subject, arbitration shall be the sole, exclusive and final remedy for any dispute between Employee and the Company.  Accordingly, except as provided for by the Procedure and this Agreement (including, without limitation, Section 7 hereof) or any other agreement, plan or written policy to which you may be subject, neither Employee nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration.  Notwithstanding the foregoing, the arbitrator will not have the authority to disregard or refuse to enforce any lawful policy of the Company, and the arbitrator shall not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.

(iv)     In addition to the right under the Procedure to petition the court for provisional relief, Employee agrees that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this Agreement.

(v)     Except to the extent otherwise provided herein, Employee agrees that the arbitration shall be conducted on a strictly confidential basis and Employee will not disclose the existence or nature of a claim, any documents, exhibits or information exchanged or presented in connection with such a claim or the decision or result of any such claim to any third party except Employee's legal counsel, who shall also be bound by the confidentiality provision of this Section 8(b)(v).

(vi)     Employee understands that this Agreement does not prohibit Employee from pursuing an administrative claim with a local, state or federal administrative body such as the Department of Labor, the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission or the Workers' Compensation Board.  This Agreement does, however, preclude Employee from pursuing court action regarding any such claim. Employee also understands and agrees that after exhaustion of administrative remedies under a statute that requires exhaustion of administrative proceedings before seeking relief, Employee must pursue any such claim through this binding arbitration procedure.

(c)     Entire Agreement/Amendments.  Except as otherwise provided herein, this Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes any other agreement with respect to the subject matter hereof (including

any prior version of this Agreement).  Except as otherwise provided herein, there are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties with respect to the subject matter herein other than those expressly set forth herein.  This Agreement may not be altered, modified, or amended except by written instrument signed by the parties hereto.  The foregoing notwithstanding, this Agreement will not supersede changes to the duration of any restrictive covenant and related enforcement provisions included in any equity incentive award issued by the Company, even if issued on or prior to the date hereof.

(d)     No Waiver.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(e)     Severability.  In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

(f)     Assignment.  This Agreement shall not be assignable by Employee.  This Agreement may be assigned by the Company to a Person that is an affiliate or a successor in interest to all or substantially all of the business operations of the Company; provided such Person agrees to abide by the terms of this Agreement.  Upon such assignment in accordance herewith, the rights and obligations of the Company hereunder shall become the rights and obligations of such affiliate or successor Person; provided that in no event shall the provisions of this Agreement be interpreted to apply to the affiliate or the successor Person other than with respect to the business of the Company that is so assigned as of such date (including, without limitation, the business it is engaged in, its employees, Clients and its Confidential Information).

(g)     Successors; Binding Agreement.  This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees of the parties hereto.

(h)     Counterparts.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

(i)     Effectiveness of Agreement.  The effectiveness of this Agreement shall be conditioned upon the Employee's commencing employment with the Company.  In the event that the Employee does not commence employment with the Company, this Agreement shall be void ab initio.

(j)     Amendment and Restatement.  The parties hereby amend and restate the Original Agreement by replacing and/or substituting the terms of this Agreement for the Original Agreement in its entirety.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first set forth above.

Greenwich Quantitative Research LLC

By: _____
    Gene Reilly
    Authorized Signatory

EMPLOYEE

_____
Michael Aksman

# EXHIBIT "C"

[Employment Agreement dated March 7, 2019]



GREENWICH
QUANTITATIVE
RESEARCH

March 7, 2019

Dear Michael,

Greenwich Quantitative Research LP (the "Company") is an asset management firm
specializing in the quantitative trading of global equities (the "Business"). Its vision is to develop
and utilize technological innovations that analyze data in order to deliver superior investment
returns. Its team has been carefully selected for their best-in-class performance and
demonstrated expertise across a number of diverse disciplines. Overall, its management team
has a deep interest in its overall financial performance, developing its people and providing a
rewarding career and managing its risk and reputation.

Following our recent discussions, I am pleased to offer you (sometimes referred to as
"Employee" below) employment as Senior U.S. Portfolio Manager on the terms set out below.
This agreement supersedes in all respects the previous offer letter between you and the
Company dated October 24th, 2017, as extended most recently by the letter agreement
between you and the Company dated January 28, 2019.

This agreement in all circumstances shall be subject to the Company raising sufficient investor
capital to support a minimum of $250,000,000 Gross Market Value ("GMV") in trading positions
("the Capital Raise") as of June 30, 2019 (the "Closing Date"). Unless otherwise agreed to by
the parties in writing, if the Company does not raise sufficient investor capital noted above by
the Closing Date, this agreement shall be void.

### Position and Location

The Company will notify you of the date of the Capital Raise (the "Notice"). While this
agreement is effective as of the date of hereof, your employment with the Company shall only
commence upon your "Start Date," which will be the date set forth in the Notice. Your Start
Date will be no later than the earlier of: 10 business days following your receipt of the Notice; or
June 30, 2019. From your Start Date you will render your services to the Company, and you will
perform such duties and responsibilities as may be designated by the Company from time to
time, commensurate with your title and position. You agree to devote substantially all of your
business time and attention to the Company and its affiliates, the promotion of the interests of
the Company and its affiliates, and the performance of your duties and responsibilities. You
further agree that on your Start Date you shall contribute such intellectual property, including
relevant source code, that is relevant to your employment with the Company and the trading of
your Trading Book (as defined below).

Your principal place of employment will be at the Company's offices in the New York, New York
area.

*Allocated Capital*

The Company will allocate $250,000,000 GMV to your trading book ("Trading Book") for the purposes of your management of trading strategies that are approved by the Company's Chief Investment Officer ("CIO") and Chief Risk Officer ("CRO") in their discretion. We expect that your Trading Book will comprise of a well-hedged portfolio of equities, ETFs and equity index futures contracts. The committed minimum investment is based upon our clearing firm providing an industry standard amount of leverage for a Trading Book that confirms to the normal aggregate risk characteristics of similar strategies.

*Trading Team*

In support of your Trading Book the Company will provide you with the capacity to hire Eugene Belozersky as an employee of the Company to be supervised by you and to engage Leon Aksman as a consultant to the Company (together with you, the "Trading Team") capped at an aggregate annual base salary of $350,000. The employment or engagement by the Company of each member of your trading team shall be conditioned upon such member's execution of relevant agreements, including as applicable, an employment agreement consultancy or other relevant engagement agreement, and a restrictive covenant agreement, as well as such member's consent to, and results satisfactory to the Company of, reference and/or background checks. Each member of the Trading Team's base salary will be reviewed at the Company's discretion on an annual basis.

*Compensation*

Our compensation philosophy is based on delivering highly competitive compensation and benefits to attract and retain top talent and to encourage a focus on the long-term growth of the Business.

*Base Salary*

Your initial base salary will be at the rate of $250,000 per annum (the "Base Salary"), payable in accordance with Company standard payroll practices in effect at the time of payment and subject to applicable tax withholding. Your Base Salary will be paid semi-monthly, with your first Base Salary payment made in respect of the period from the Start Date through the payment date. The Base Salary will be reviewed at the Company's discretion on an annual basis.

*Revenue Sharing*

You and your Trading Team will be eligible for an aggregate special incentive bonus ("Revenue Bonus"), less applicable tax withholding, determined based on a percentage of the annual Adjusted Incentive Revenues (defined below) that you generate. The percentage will be determined as follows:

- A Sharpe ratio equal to and greater than 3:                    60%
- A Sharpe ratio equal to and greater than 2 but less than 3: 50%
- A Sharpe ratio less than 2:                                               40%

The Revenue Bonus will be payable as a lump sum cash payment to you and each member of your Trading Team in the fiscal year following the fiscal year for which the Revenue Bonus is attributable, and in all events not later than the 60th day following the end of the fiscal year for

Case 1:20-cv-08045-PAE Document 1-1 Filed 09/29/20 Page 52 of 67

which the Revenue Bonus is attributable (currently the Company's fiscal year ends December 31st). Payment of any Revenue Bonus will be subject to you and each member of your Trading Team remaining employed through the payment date.

"Adjusted Incentive Revenues" for any applicable fiscal year means the U.S. dollar value of the total incentive revenues generated by you and your Trading Team for such fiscal year.

Any Revenue Bonus payable to you and your Trading Team shall be reduced by (i) the aggregate base salary paid to you and your Trading Team for such fiscal year, and (ii) the aggregate overhead expenses of the Company allocable to you and your Trading Team. The calculation and determination of the Adjusted Incentive Revenues and Revenue Bonus, including any adjustments for extraordinary items or nonrecurring events, will be determined by the Company in its sole discretion.

### Equity Profit Participation Plan

Additionally, you will be eligible to participate in the Company's Equity Profit Participation Plan (the "Plan"). Participation in the Plan will be subject to you managing a minimum of 40% of the Company's GMV and generating a minimum 4% return on long GMV and maintaining a minimum Sharpe ratio of 2.5. The Plan will represent a 30% interest in the net income of the Company (the "Net Income Interest") allocable as follows: (i) a 12.5% Net Income Interest shall be allocated to you on your Start Date if all members of your Trading Team are also employed or engaged, as applicable, by the Company as of your Start Date; (ii) a 2.5% Net Income Interest shall be allocated to Eugene Belozersky on your Start Date if all members of the Trading Team are employed or engaged, as applicable, by the Company as of your Start Date; and (iii) the remaining portion of the 30% total Net Income Interest (i.e., either 15% or the full 30% if each member of your Trading Team is not employed by the Company on your Start Date) shall be allocable to you and Eugene Belozersky on a jump ball basis over two years, with Eugene Belozersky to be allocated 16.66% of the portion of the Net Income Interest so allocated and the remainder of such portion to be allocated to you. Additionally, the Company will provide you with the capacity to reallocate to the other members of the Trading Team the portion of your Net Income Interest that is allocable to you on a jump ball basis over two years. The terms of the Plan will be provided to you at a later date.

### Discretionary Bonus

You will also be eligible to participate in the Company's annual bonus plan.  The amount of any annual bonus payable to you will be determined by the Company in its sole discretion, based on your performance and the performance of the Business. Payment of any annual bonus will be subject to your remaining employed through the payment date.

### Employee Benefits

You will be eligible to participate in the Company's health, welfare, vacation and other benefit plans from time to time in effect for similarly situated employees of the Company generally. Your participation in such benefit plans will be subject to the terms of the applicable plan documents and the Company's generally applicable policies.  Nothing in this agreement is intended, or shall be construed, to require the Company or its affiliates to institute or continue any particular benefit plan or arrangement, and such benefit plans or arrangements may be changed, terminated or reduced from time to time, in the sole discretion of the Company.

### *Termination*

Please note that your employment with the Company is on an "at will" basis. That means that you may terminate your employment at any time, for any or no reason, and the Company reserves the same right. Nothing in this offer is intended to create a contract for employment, guarantee of continued employment with the Company, or guarantee of any particular compensation or benefit level.

If the Company terminates your employment other than due to your death or disability (within the meaning of the Company's long-term disability plan as in effect from time to time) and other than due to Cause, the Company shall provide you not less than 90 days' advanced written notice prior to the effective date of such termination. Notwithstanding the foregoing, the Company may in its discretion elect to accelerate the termination date and waive such period of notice or any portion thereof, but in case of such acceleration and waiver you shall receive continued payments of your Base Salary until the 90th day following the date the Company first delivered its notice of termination. For the avoidance of doubt, the Company may terminate your employment for Cause without notice.

As used herein, "Cause" means a finding by the Company in good faith of: (a) your material breach of this agreement or Restrictive Covenant Agreement, (b) your negligence or willful misconduct, or willful failure to attempt in good faith to substantially perform your duties (other than due to physical illness or incapacity), (c) your conviction of, or plea of guilty or nolo contendere to, or confession to, (i) a misdemeanor involving moral turpitude or (ii) a felony (or the equivalent of a misdemeanor involving moral turpitude or felony in a jurisdiction other than the United States), (d) your fraud or misappropriation, embezzlement or material misuse of funds or property belonging to the Company, (e) willful or reckless misconduct which results in or could reasonably be expected to result in material damage to the property, business or reputation of the Company or (f) a determination by the Company (in its sole discretion) that you are unable to perform the services contemplated by this agreement to the satisfaction of the Company.

Any payments made pursuant to this agreement are intended to comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), and this agreement shall be construed with such intent. Any such payments, to the extent subject to Section 409A, shall be treated as separate payments for purposes of Section 409A.

If you resign from your employment for any reason, you shall provide the Company not less than 90 days' advanced written notice prior to the effective date of such resignation. Notwithstanding the foregoing, the Company may in its discretion elect to accelerate the termination date and waive such period of notice or any portion thereof and will not be required to pay you for the 90-day notice period.

During any applicable notice period (whether due to a termination by the Company or by you, as described above), the Company at its discretion may implement a "garden leave" period during which you will not be required to report to the Company's offices, but shall be required to be available remotely. During any such garden leave, you will remain a Company employee, and you agree to cooperate reasonably in the transition of your duties to other Company personnel and remain bound by all of your duties and obligations to the Company, including, without limitation, the obligations stated in the Restrictive Covenant Agreement and the duties and obligations applicable to you under common law.

### Liquidated Damages

Provided the Company raises the investor capital noted above by the Closing Date (or such other agreed upon date by the parties), the Employee expressly acknowledges and agrees that, in the event the Employee breaches this Agreement by not providing his services to the Company on the agreed upon Start Date, proof of the Company's total loss and/or the calculation of its total momentary damages will be difficult to determine. Employee expressly agrees that, because of factors unique to the financial services industry, liquidated damages alone cannot fully compensate the Company for all possible harm it will suffer as a result of a breach of this Agreement. Employee, however, expressly agrees that in the event of a breach, the Company and its Affiliates shall be entitled to relief that includes, but is not limited to, liquidated damages as provided herein. Employee expressly acknowledges and agrees that the following liquidated damages amounts are reasonable in light of the anticipated or actual immediate monetary harm that will be caused by such breach of this Agreement and are not a penalty. Employee further acknowledges and expressly agrees that the following liquidated damages constitute a good faith estimate of actual immediate monetary damages that will probably ensue to the Company and its Affiliates as the result of a breach. With the foregoing in mind, Employee acknowledges and agrees that, in the event of his breach of this agreement by Employee not working for the Company as of the Start Date, the Company and its Affiliates shall be entitled to liquidated damages in an amount equal to $170,000.

### Other Terms and Conditions

As consideration for your employment and the other consideration set forth in this agreement, you agree to execute and deliver to the Company the Restrictive Covenant Agreement, which has been separately provided to you. Your employment is conditioned upon your execution of this agreement and the Restrictive Covenant Agreement, your contribution of the Prior Works on the Start Date, as well as your consent to, and results satisfactory to the Company of, reference and/or background checks.

In addition, in accordance with U.S. federal law, you will be required to provide documentation verifying your employment eligibility within 72 hours of your commencement of employment with the Company.

As an employee of the Company, your continued service (and receipt of compensation hereunder) will be subject to your continued employment in good standing which will include, among other things, your adherence to all applicable laws and the Company's policies and procedures and other applicable compliance manuals currently in existence or that may be adopted in the future, copies of which will be separately made available to you. You agree to execute any customary forms and agreements in connection with the foregoing.

* * * * *

This agreement will be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to its principles of conflict of laws. This agreement may not be amended except in writing and signed by an authorized agent of the Company and yourself.

In accepting this offer, you acknowledge that this agreement constitutes the entire understanding of your employment with the Company and that any previous or current agreements, discussions, negotiations, or understandings that are not set forth in this

agreement are superseded.  In the event that any one or more of the provisions of this agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this agreement shall not be affected thereby.

Please sign a copy of this agreement as indicated below and return the signed copy to me.  If you have any questions concerning this agreement, please contact me at (203) 489-6986.

I believe that you will be an important member of the team and. I am excited to present you with this opportunity.  I hope you will join us as we move forward with the Business.

Sincerely,

GREENWICH QUANTITATIVE RESEARCH LP

By:_____

Gene Reilly
Chief Investment Officer

Acknowledged and Agreed:

_____
Michael Aksman

Case 1:20-cv-08045-PAE   Document 1-1   Filed 09/29/20   Page 56 of 67

# EXHIBIT "D"

[Affidavit of Michael Aksman dated September 8, 2020]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————————X         Index No.

In the Matter of the Application of

MICHAEL AKSMAN,

                         Petitioner,              **AFFIDAVIT OF**
                                                  **MICHAEL AKSMAN**

For a judgment pursuant to
Article 75 of the C.P.L.R.

          -against-

GREENWICH QUANTITATIVE RESEARCH, LP,

                         Respondent.
———————————————————————————X

STATE OF NEW JERSEY    }
                       } ss.:
COUNTY OF SOMERSET     }

          MICHAEL AKSMAN, being duly sworn, deposes and says that I am over the age

of 18 years, reside in the State of New York and am the Petitioner in this action.

          1.     I have been negotiating with Greenwich Quantitative Research, LP, to

become to become a Senior U.S. Portfolio Manager since 2017. The most recent iteration

of the Letter of Employment solely drafted by Respondent was dated March 7, 2019. An

initial proposal dated October 24, 2017 and January 28, 2019, were superseded by the

letter offer dated March 7, 2019.

          2.     In their proposed Letter of Employment to me, Respondent was quite clear

that:

> "This agreement in all circumstances shall be subject to the Company
> raising sufficient investor capital to support a minimum of
> $250,000,000 Gross Market Value ("GMV") in trading positions ("the
> Capital Raise") as of June 30, 2019 (the 'Closing Date'). Unless
> otherwise agreed to by the parties in writing, if the Company does
> not raise sufficient investor capital noted above by the Closing Date,
> this agreement shall be void."

3.     Further, Respondent was required to provide me with notice of when the
capital was raised. The proposed agreement clearly indicated that:

> Your Start Date will be no later than the earlier of: 10 business days
> following your receipt of the Notice; or June 30, 2019. From your
> Start Date you will render your services to the Company, and you
> will perform such duties and responsibilities as may be designated
> by the Company from time to time, commensurate with your title
> and position.

4.     I never received any notice that Respondent raised the required capital of
$250,000,000. Therefore, the proposed agreement became null and void on June 30, 2019.

5.     The record established by the arbitrator is clear that the requisite
$250,000,000 capital was never raised by Respondent. The Arbitrator stated that
Respondent's sole witness, Gene Reilly, "anticipated launching the fund in late 2019",
which is contrary to the offer of employment that became void on June 30, 2019.

6.     Further, the arbitrator stated that Respondent "maintains that it had a $150
commitment from a large state pension fund which… would have permitted it to launch
its fund." Assuming arguendo the arbitrator meant to state $150,000,000, this is far short
of the required $250,000,000 required to make me an employee of Respondent.

7.     The arbitrator failed to discuss the condition precedent of Respondent
having to raise $250,000,000 before my employment would commence.

8.     The Restrictive Covenants Agreement was signed at the same time as the
Letter Offer of Employment in or about March 7, 2019. The Restrictive Covenants
agreement is only applicable to employees of Respondent. I never became an employee
of Respondent.

9.     I received no consideration for executing the Restrictive Covenants
Agreement other than the offer of employment that became null and void on June 30,
2019.

10.     As further indicia that employment never began, I was supposed to receive an annual salary of $250,000 per annum, benefits that are offered to other employees, a budget of $350,000 to hire Eugene Belozersky as an employee and Leon Aksman as a consultant, participate in profit sharing and a discretionary bonus in addition to a non-discretionary revenue bonus. I never received any compensation or benefits from Respondent. Respondent wants to treat me as an employee with respect to the Restrictive Covenants Agreement without ever treating me as an employee in any other respect.

11.     The Notice of Arbitration was never properly served on me. The Notice of Arbitration listed my address as 400 Washington Avenue, Martinsville, NJ 08836, which was not my address at the time Arbitration was commenced.

12.     The arbitrator conducted an *ex parte* preliminary telephone conference on January 15, 2020, scheduling deadlines without my participation or knowledge.

13.     Respondent alleges that service of process was made on January 16, 2020. I deny this. I have no knowledge whether the purported service of process was made at 400 Washington Avenue, Martinsville, NJ 08836, as indicated in the Notice of Arbitration, but that was not my address.

14.     Respondent alleges my wife was served but this is denied as completely false. See the attached affidavit of my wife, Maria Aksman.

15.     Respondent further alleges that despite the fact they claim service was properly made on my wife, the process server voluntarily stayed around my house longer and that the process server served me in the passenger seat of my wife's car stopped at a stop sign. This too is denied as completely false. If the process server did allegedly stay around my house, why would he not serve me as I exited my house? The allegation that the process server came up to a moving car stopped at a stop sign is preposterous. The allegation continues that I was purportedly served through the window despite it being

the middle of winter. If a stranger approached me in a car in the middle of winter, the last thing I would do is lower my window. The description relied on the arbitrator simply did not happen.

16.     I was never contractually bound to arbitration and I was prevented from participating in the arbitration proceeding. It is evident that the award of damages bears no semblance with reality.

17.     Even if I was an employee of Respondent, which I was not, at all times I as an at-will employee. Therefore, there is no basis for to extrapolate damages out for one year when I could have quit or been terminated at any time.

18.     Further, profits, if any, are pure speculation. I was not obligated to trade anything less than $250,000,000 and by the arbitrator's own admission, Respondent never raised the sufficient capital to trade.

19.     Lastly, the arbitration award was issued on June 26, 2020. This occurred after the worst stock market depression since 1929. The award of $3,087,480 in damages is speculative at best for any trading strategy during a volatile and unprecedented time when the stock market plummeted due to the Covid-19 virus and tariff wars.

20.     The arbitrator also awarded an excessive amount for attorney fees in the amount of $174,707. This was not a complicated proceeding and it was conducted on default. In essence, Respondent's lawyers participated in two telephone conferences with the arbitrator and a one-day arbitration consisting of only one witness.

21.     Lastly, a punitive damages award of $750,000 is not warranted under the facts. There can be no basis for any punitive damages. I never became an employee. Respondent issued a prospective offer of employment with conditions precedent that never occurred by Respondent's own failure to raise sufficient capital resulting in the proposed agreement becoming null and void on June 30, 2019.

Case 1:20-cv-08045-PAE   Document 1-1   Filed 09/29/20   Page 61 of 67

WHEREFORE, I respectfully request that the Arbitration Award dated June 26, 2020, be vacated in its entirety.

_____

MICHAEL AKSMAN

Sworn to before me on this

_____ day of September, 2020

_____

Notary Public

My commission expires:

TARSEM TANEJA
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES 5/12/2024

# EXHIBIT "E"

[Affidavit of Maria Aksman dated September 8, 2020]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

—————————————————————————— X      Index No.

In the Matter of the Application of

MICHAEL AKSMAN,

                              Petitioner,              **AFFIDAVIT OF**
                                                       **MARIA AKSMAN**

For a judgment pursuant to
Article 75 of the C.P.L.R.

        -against-

GREENWICH QUANTITATIVE RESEARCH, LP,

                              Respondent.

—————————————————————————— X

STATE OF NEW JERSEY   }
                      } ss.:
COUNTY OF SOMERSET    }

        MARIA AKSMAN, being duly sworn, deposes and says that I am over the age of

18 years, reside in the State of New Jersey.

        1.      I am not a party to this action.

        2.      Greenwich Quantitative Research, LP, alleges that a process server served

me legal papers on behalf of my husband. This simply did not happen. I would remember

being served legal papers and I would immediately turn them over to my husband. At

no time did I receive any legal papers on behalf of my husband.

        3.      Greenwich Quantitative Research, LP, further alleges that a process server

came up to a car I was driving and served my husband through a window on the

passenger seat. This too never happened. I find it incredible that someone would come

up to a car that is presumably stopped for a few seconds at a stop sign. In January 2019

all of the car windows would be closed.

Further Affiant Sayeth Naught

MARIA AKSMAN

Sworn to before me on this
___ day of September, 2020

Notary Public
My commission expires:

TARSEM TANEJA
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES 5/12/2024

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840
(rev. 07/29/2019)

## New York Supreme COURT, COUNTY OF New York

Index No: _____     Date Index Issued: _____

| | For Court Use Only: |
|---|---|
| | IAS Entry Date |

**CAPTION**     Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Michael Aksman

-against-

Greenwich Quantitative Research, LP

Plaintiff(s)/Petitioner(s)

Defendant(s)/Respondent(s)

Judge Assigned

RJI Filed Date

**NATURE OF ACTION OR PROCEEDING:** Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): 

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**REAL PROPERTY:**     Specify how many properties the application includes: 
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):   ☐ Residential    ☐ Commercial
  Property Address: 

  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*

- ☐ Tax Certiorari - Section:        Block:        Lot:
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): 

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution    [see *NOTE* in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): 

**MATRIMONIAL**
- ☐ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum (UCS-840M).*

  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**TORTS**
- ☐ Asbestos
- ☐ Child Victims Act
- ☐ Environmental (specify): 
- ☐ Medical, Dental, or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): 
- ☐ Other Negligence (specify): 
- ☐ Other Professional Malpractice (specify): 
- ☐ Other Tort (specify): 

**SPECIAL PROCEEDINGS**
- ☒ CPLR Article 75 (Arbitration)    [see *NOTE* in **COMMERCIAL** section]
- ☐ CPLR Article 78 (Body or Officer)
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 (Kendra's Law)
- ☐ MHL Article 10 (Sex Offender Confinement-Initial)
- ☐ MHL Article 10 (Sex Offender Confinement-Review)
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): 
- ☐ Other Special Proceeding (specify): 

**STATUS OF ACTION OR PROCEEDING:**     Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION:** Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental, or Podiatric Malpractice     Date Issue Joined: _____
- ☐ Notice of Motion     Relief Requested: _____     Return Date: _____
- ☒ Notice of Petition     Relief Requested: Vacate - Decision/Order/Judgment/Award     Return Date: 10/07/2020
- ☐ Order to Show Cause     Relief Requested: _____     Return Date: _____
- ☐ Other Ex Parte Application     Relief Requested: _____
- ☐ Poor Person Application
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☐ Other (specify):

**RELATED CASES:** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PARTIES:** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Un-Rep | Parties (List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant; 3rd party plaintiff, etc.) | Attorneys and/or Unrepresented Litigants (For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email.) | Issue Joined (For each defendant, indicate if issue has been joined.) | Insurance (For each defendant, indicate insurance carrier, if applicable.) |
|---|---|---|---|---|
| ☐ | Name: Aksman, Michael<br><br>Role(s): Plaintiff/Petitioner | ADAM PASKOFF, PASKOFF & TAMBER, LLP, 225 W 34TH ST STE 1303 , NEW YORK, NY  10122, skofflaw@att.net | ☐ YES  ☒ NO |  |
| ☐ | Name: Greenwich Quantitative Research, LP<br>Role(s): Defendant/Respondent | Paul Rauser, Aegis Law Group LLP, 801 Pennsylvania Ave NW, #740, Washington, DC  20004, (202) 706-7031, prauser@aegislawgroup.com | ☐ YES  ☒ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES  ☐ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  09/08/2020

| ADAM PASKOFF |
|---|
| Signature |

| 2482784 | ADAM PASKOFF |
|---|---|
| Attorney Registration Number | Print Name |

*This form was generated by NYSCEF*

UCS-840C
3/2011

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF** New York

_____ x

Michael Aksman

                           **Plaintiff(s)/Petitioner(s)**

-against-

Greenwich Quantitative Research, LP

                       **Defendant(s)/Respondent(s)**

_____ x

**Index No:**

**RJI No. (if any):**

## COMMERCIAL DIVISION

**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☐ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☒ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

    Vacate Arbitration Award

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) and (c).**

**Dated:** 09/08/2020

                                        ADAM PASKOFF

                                        **SIGNATURE**

                                        ADAM PASKOFF

                                  **PRINT OR TYPE NAME**

_This form was generated by NYSCEF_