# Exhibit D

**JAMS ARBITRATION NO. 1425031204**

GREENWICH QUANTITATIVE RESEARCH LP,

Claimant,

-against-

MICHAEL AKSMAN,

Respondent.

**FINAL ARBITRATION AWARD**

The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement set forth in a Restrictive Covenants Agreement, dated March 7, 2019 ("Agreement"), between Claimant Greenwich Quantitative Research LP ("Greenwich") and Respondent Michael Aksman ("Aksman"), hereby issues the following Final Arbitration Award.

I.      Introduction

Greenwich is a Delaware asset management firm that specializes in the trading of global equities.  In 2017, Greenwich hired Aksman to be the Senior Portfolio Manager for a newly-created fund.  Greenwich hired Aksman based on representations that he had made concerning his past trading success that turned out to be fraudulent.

In this proceeding, Greenwich seeks to recover the damages it sustained as a result of Aksman's misrepresentations.  Greenwich's factual assertions concerning Aksman's misconduct are essentially uncontradicted because Aksman has refused to participate in the arbitration despite having received repeated notice of its pendency.

II.     Procedural History

   The Agreement provides that its terms "shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions thereof."  (Agreement § 8(a)).  In the Agreement, Aksman further agreed that, in consideration of his employment, "any and all controversies, claims, or disputes with anyone (including [Greenwich] and any employee, officer, director, stockholder or benefit plan of [Greenwich] . . . ) arising out of, relating to, or resulting from [his] employment with [Greenwich]  or the termination of [his] employment with [Greenwich], including any breach of th[e] Agreement, shall be subject to binding arbitration" at JAMS, pursuant to the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), "before a sole arbitrator who shall be a lawyer."  Id. § 8(b)(i), (ii) (block capitalization omitted).  Finally, the Agreement provides that the decision of the arbitrator shall be binding upon Aksman.  Id. § (b)(ii).

   On or about November 8, 2019, Greenwich submitted to JAMS a Demand for Arbitration ("Demand") in which it detailed its claims against Aksman.  Greenwich sought approximately ten million dollars in damages by reason of Aksman's alleged fraud.

   On November 8, 2019, Greenwich's counsel, Serine Consolino, Esq., notified Aksman of the pendency of this proceeding by emailing a copy of the Demand to him at his email address, maksman123@gmail.com, and sending a second copy by Federal Express to his residence, 8 Kent Place, North Plainfield, New Jersey 07063.  Ms. Consolino received no response to the email and the Federal Express package was returned to her.

   Thereafter, on January 16, 2020, Kenneth Cummings ("Cummings") effected personal service on Aksman in two different ways.  First, Cummings served a woman at Aksman's residence in North Plainfield, New Jersey.  At the time of service, there was a vehicle

in the driveway, which Cummings determined was registered to Maria T. Platt-Aksman,
presumably Aksman's wife.  Second, a little while later, Cummings saw the same vehicle at a
stop sign near Aksman's house.  The vehicle was being driven by the woman whom he
previously had served; based on photographs that he had viewed on social media, Cummings
determined that Aksman was the passenger.  After Cummings walked to the passenger side of
the vehicle, Aksman lowered his window partially, but when Cummings attempted to serve him,
Aksman pushed the papers back out of the window.  The vehicle then drove away.

On January 15, 2020 (the day before Cummings effected personal service on
Aksman), I held a preliminary telephone conference in this matter.  I set March 16, 2020, as the
deadline to complete discovery and April 16, 2020, as the date for the evidentiary hearing.
Aksman received advance notice of the preliminary conference via email on January 13, 2020,
and was sent a copy of the order resulting from the conference.  Aksman did not respond to
either of these communications.

Due to the COVID-19 pandemic, the hearing could not be held as scheduled in
person.  Accordingly, I determined that it would be held via a Zoom teleconference.  Rule 22(g)
of the JAMS Rules expressly permits the Arbitrator to require that a hearing or any portion
thereof be held in that manner.  To discuss the logistics of the virtual hearing, I held an additional
telephone conference on April 8, 2020.  Aksman received email notice of that conference but did
not attend.

Following the April 8 conference, I issued an order explaining why the hearing in
this matter would be held via teleconference.  Aksman received a copy of this order by email but
did not respond.  Aksman also received an emailed notice of the Zoom hearing but did not
appear.

3

During the hearing, only one witness testified:  Gene Reilly ("Reilly"),
Greenwich's Chief Investment Officer.  In addition, Greenwich introduced in support of its claim
nearly ninety exhibits and the declarations of Sean Trager ("Trager") and Paul C. Rauser, Esq.

Following the hearing, I issued an order directing that post-hearing submissions
be made by May 1, 2020.  Aksman received a copy of that order via email but has not made any
submission to the Arbitrator.  Greenwich's post-hearing submission, on the other hand, was
timely received.

JAMS Rule 24(a) provides for an award to be issued within thirty days after the
hearing is closed.  Since I received the Claimant's post-hearing submissions on May 1, 2020, the
award originally was due on June 3, 2020.  Owing to the press of business, I requested a thirty-
day extension of that deadline.  Greenwich consented, and Aksman did not oppose the request,
despite having received email notice of it.  This Final Arbitration Award is therefore timely.

III.    Relevant Facts

The uncontradicted evidence establishes as follows:

Greenwich's sole witness, Reilly, has had a lengthy career in the financial
services industry, in the course of which he served as a partner at Goldman Sachs, where he
managed Pan-Asian equity trading, and oversaw global quantitative trading for Merrill Lynch.
In 2017, he founded Greenwich to provide market neutral quantitative investment products for
institutional clients, such as pension and hedge funds and endowments.  He anticipated launching
the fund in late 2019.

One of the first steps that Reilly pursued was to hire a Senior Portfolio Manager
for the fund.  Through a recruiter, he located Aksman, whose résumé indicated that he had a
master's degree in Computational Mathematics from MIT and a PhD in Theoretical Physics from

the Soviet Academy of Sciences.  The résumé also reflected substantial experience trading

equities.  Aksman represented to Reilly that he was managing a $10 million personal equity

account housed at Wedbush Securities on behalf of Stefano Brocco, a partner at A.R.T.

Advisors, a well-regarded quantitative investment firm in New York.  During the interview

process, Aksman gave Reilly purported Wedbush Equity Summary Reports, which suggested

that he was trading Brocco's managed account very successfully.  Aksman further represented

that the reports were Wedbush documents.

       Aksman also provided copies of his personal tax returns which seemed consistent

with the earnings that he would have been likely to receive for managing Brocco's account.

Although Aksman was unable to provided audited financials for the Wedbush account, he stated

that this was because his investment advisory agreement with Brocco precluded such disclosure,

which seemed plausible at the time.

       After verifying Aksman's prior employment, and checking to make sure that the

income on his tax returns was consistent with the terms of his alleged arrangement with Brocco,

Greenwich hired Aksman as a portfolio manager.  At that time, Aksman signed a Restrictive

Covenants Agreement, dated October 24, 2017, which contained language concerning arbitration

identical to the language of the Agreement that Aksman later signed in 2019.  Although the

counterparty on the 2017 agreement was Greenwich Quantitative Research LLC, the agreement

applied not only to that company, but also to any of its affiliates.

       After he was hired, Aksman provided Greenwich with monthly updates

concerning his alleged trading for the Brocco account.  In addition, he repeatedly verified the

authenticity of that account in communications with Reilly and other Greenwich employees.

Greenwich, in turn, used the performance of the Brocco account to create simulated account

information that it used to tout Aksman's trading success to potential investors in its fund.  Over time, Greenwich made representations concerning Aksman's purported trading activities to approximately seventy such institutional investors. Among other statements, Greenwich represented that the simulated results were based on an actual account managed by Aksman. Aksman himself also filled out a questionnaire from a potential investor in which he represented that "We daily compare our PNL with broker reports," thereby confirming that he was engaged in actual trading.  He similarly responded to many other questions concerning his trading using the present tense.

At times, Aksman also participated directly in efforts to solicit funds from investors for the Greenwich portfolio that he would manage.  During many of those meetings, he represented to potential investors that he was actively managing an account at Wedbush.  Indeed, during one such meeting, in July 2019, he told representatives of Morgan Stanley Alternative Investment Partners details about the account that he allegedly was managing for Brocco at A.R.T. Advisors.  During another meeting with a prominent investment consultant retained by the Texas Teachers Retirement System, Aksman confirmed that he was applying his trading strategies to a live managed account.  The consultant in turn sent a report that discussed Aksman's alleged trading to hundreds of pension funds, sovereign wealth funds, and endowments, including several prospective investors in the Greenwich fund.  In that report, the consultant noted that Greenwich had hired one portfolio manager who was "already trading the strategy live in a managed account."

During the summer of 2019, Greenwich retained James Alpha, an investment advisor, to assist in its efforts to market the new fund.  James Alpha then decided to establish an account for one of its clients that Greenwich would trade so that it could generate an audited

track record of Aksman's performance.  Because of Aksman's alleged trading for Brocco, James Alpha opted to use Wedbush as the prime broker for that account.

When Reilly and representatives of James Alpha placed a telephone call to Wedbush to establish the account, Trager, a Wedbush vice president, requested certain trading parameters so that he could prepare a price quote.  After Reilly suggested that he simply use the parameters for Aksman's existing Wedbush account, Trager responded that he could not locate such an account on Wedbush's system.

Over the next few weeks, Aksman sought to cover his tracks.  First, he insisted that Trager was simply mistaken.  Then, he suggested that Trager might be prohibited from discussing the details of Wedbush customer accounts.  On September 23, 2019, however, Greenwich obtained from James Alpha a copy of an email exchange in which Trager unambiguously informed Aksman:  "You know full well there is 'no active account [at Wedbush] and that more specifically there is no cash on deposit or positions."

As his scheme was coming undone, Aksman made various inconsistent statements regarding the alleged Brocco account.  On September 25, 2019, he stated in an email to Reilly that "Stefano got wind of [the] controversy and closed the account recently."  Subsequently, during a conference call with Reilly and others on October 3, 2019, Aksman said that the account had been closed more than one year earlier.  In an October 12, 2019 email, Aksman said that the account was closed at the end of 2018.

Aksman also declined Reilly's request that he provide official tax return transcripts that could have helped verify Aksman's claims concerning the income he allegedly had received for trading the Brocco account.

In truth, as Trager subsequently explained in a declaration, neither Aksman nor his company had managed any equity account at Wedbush over the preceding five years. Greenwich, of course, would not have hired Aksman as a portfolio manager had it known that his representations regarding the Brocco account were false.

IV.     Discussion

     A.     Personal Jurisdiction

Since Aksman has not appeared, some discussion of the manner in which he was served is warranted.

For service of process to be effective, it must satisfy the due process requirements of the Fourteenth Amendment, which means that the defendant be given adequate notice of the claims being made against him.  Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313-14 (1950).  Additionally, at least when service is made in connection with a judicial proceeding, there must be a statutory basis for the form of service that is made.

Here, the Agreement giving rise to this arbitration states that Delaware law applies.  Under Delaware law, service of process on an individual may be made in any manner that is permissible under the laws of the state where service is made for actions in its courts of general jurisdiction.  See Del. Code Ann. tit. 10, § 3104(d)(2).  The efficacy of service upon Aksman therefore is appropriately determined using New Jersey law.

Section 4:4-4(a) of the New Jersey Rules of Court provides that service of process may be effected upon an individual either by serving him personally or by leaving a copy of the summons and complaint at the individual's usual dwelling place or place of abode with a competent member of the household over the age of fourteen then residing there.  There seems to be little doubt that the service of the Demand in this case satisfies both alternative means since

(i) a woman, presumably Aksman's wife, accepted a copy at his residence, and (ii) he himself was given a copy only a little while later, although he pushed the papers out of the vehicle in which he was riding before he was driven away.

Moreover, Aksman also received a copy of the Demand from counsel via email and there is no indication that he had abandoned his email address by the time it was sent. Indeed, since the initial service of the Demand, Aksman has repeatedly received emails from JAMS concerning procedural aspects of this case, none of which bounced back as undeliverable.

In these circumstances, it is clear that Aksman has received sufficient notice of the Demand and the relief that Greenwich is seeking.

B.   <u>Fraud</u>

Under Delaware law, a party seeking to establish a claim of fraudulent misrepresentation must show:  "(1) that the defendant made a false representation of a material fact to the plaintiff; (2) that the defendant [had] . . . knowledge of the falsity of the representation, while the plaintiff [was] . . . ignorant of the falsity; (3) that the misrepresentation was made with the intent that the plaintiff would believe it to be true, act in reliance thereon, and be deceived thereby; and (4) that the plaintiff actually did so believe, act, and was deceived, as well as having been harmed thereby."  <u>Lechliter v. Del. Dep't of Nat. Res. & Envtl. Control</u>, No. 7939-VCG, 2015 WL 9591587, at *18 (Del.Ch. Dec. 31, 2015).   Here, it frankly would be difficult to conceive of a fraud more blatant than the one that Aksman perpetrated upon Greenwich.

Turning to each of the required elements of Greenwich's claim, it is clear that Greenwich has made the showing necessary to recover damages for fraud.  First, as Trager's declaration alone establishes, the repeated statements that Aksman made to Greenwich and

others concerning his trading of an equities account at Wedbush for Brocco were a complete

fabrication.  Moreover, these false statements obviously were material since they induced

Greenwich to hire Aksman as a portfolio manager.  Second, Aksman unquestionably must have

known that his statements were false since he eventually conceded that he had not been

managing an account for Brocco at Wedbush at the time they were made.  Although Greenwich

undertook efforts to verify Aksman's representations, it also is apparent that the firm was

unaware of the fraud since someone of Reilly's stature in the investment community would not

have attempted to market a fund based on Aksman's alleged trading prowess had he known the

truth.  Third, it is clear that Aksman lied to Greenwich simply so that the firm would give him a

job – and other benefits  –  for which he otherwise would have been ineligible.  Finally, because

Greenwich spent considerable sums to launch the fund that Aksman had been retained to

spearhead, there can be no question that Greenwich's reliance on Aksman's misrepresentations

has caused it considerable financial harm.

       For these reasons, Greenwich is entitled to recover on its fraud claim.

    C.    <u>Damages</u>

        1.    <u>Compensatory Damages</u>

       In <u>Stephenson v. Capano Development Corp, Inc.</u>, 462 A.2d 1069, 1076 (Del.

1983), the Delaware Supreme Court explained that "Delaware law recognizes two measures of

damages . . . in cases of fraud or deceit."  The more common "benefit of the bargain" standard

"put[s] the plaintiff in the same financial position that he would have been in if the defendant's

representations had been true."  <u>Id.</u>  The other (less frequently invoked) "out-of-pocket measure"

"is designed to restore the plaintiff to his financial position before the transaction occurred."  <u>Id.</u>

Here, Greenwich seeks the benefit of its bargain with Aksman.  In that regard, Greenwich maintains that it had a $150 commitment from a large state pension fund which, but for Aksman's fraud, would have permitted it to launch its fund.  Additionally, based on its discussions with other potential investors, including a large sovereign wealth fund, and the fact that it had received a favorable review from a prestigious consulting firm, Greenwich expected to have $375 million in assets under management by the end of its first year of operation.  Applying the financial terms that it had been negotiating with the large pension fund, and assuming that its other investors would have received similarly beneficial treatment, Greenwich concludes that it would have realized net income of $3,087,480 during its first year of operation and $4,209,994 during its second year of operation.  (The calculations underlying this contention are based on exhibits received in evidence and are set forth in a demonstrative exhibit which I will deem marked as Claimant's Exhibit 90.)  In arriving at these numbers, Greenwich used the average 11.4 percent return of six comparable funds to calculate the incentive fee it likely would have earned. Greenwich notes that this is a lower rate of return than Aksman himself estimated the fund was likely to achieve.

According to Reilly, as a consequence of Aksman's fraud, Greenwich may not be able to launch the fund it intended to have Aksman manage.  In any event, even if Greenwich can overcome the marketing and disclosure challenges arising out of Aksman's misconduct, Greenwich will have lost approximately one year of activity before it can begin operations.

Greenwich's calculations of its damages are based on a number of assumptions.  Among other things, Greenwich assumes that investors other than the sovereign wealth fund would have followed through on their expressions of interest, and that the fund would have

achieved a relatively high rate of return notwithstanding the somewhat chaotic conditions that the financial markets have been experiencing during the COVID-19 pandemic.

Nevertheless, under Delaware law, when a claimant has established "the fact of damages," "less certainty is required of the proof establishing the amount of damages," which "can be an estimate." SIGA Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1131-32 (Del. 2015) (emphasis omitted). Additionally, the mere fact that a business is a startup does not preclude an award of lost profits. See Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., 1985 WL 189018, at *4 (Del. Super. Ct. July 29, 1985) ("Lost profits on a new business may be too speculative to allow recovery if there is no evidence that the business would be profitable, but recovery for lost profits is not denied merely because a business is newly established.") (internal citation omitted).

In the absence of any evidence to suggest that Greenwich would not have launched a fund that would have had $375 million in assets under management by the end of its first year, or that it would not have achieved at least the average rate of return of six comparable funds, I find that Greenwich's estimate of the profits it has lost through at least a year of delay attributable to Aksman's fraud is reasonable. Greenwich is therefore entitled to recover lost profits in the amount of $3,087,480.

Greenwich also seeks to recover its legal fees. "[U]nder the prevailing 'American Rule,' courts generally do not award attorney's fees to a prevailing party unless some special circumstance is present." Barrows v. Bowen, No. 1454-S, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994). Here, however, the Agreement between Greenwich and Aksman expressly provides that the Arbitrator "shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law." In that regard, the Delaware courts have held

that "there are those cases in which attorney's fees are awarded against a defendant . . . because the action giving rise to the suit involved bad faith, fraud, conduct that was totally unjustified, or the like and attorney's fees are considered an appropriate part of damages. Id. (internal quotation marks omitted).

This obviously is such an exceptional case. Aksman lied to Greenwich repeatedly in an effort to obtain benefits to which he otherwise would not have been entitled. Greenwich is therefore entitled to recover its reasonable provable legal fees so that it can be restored to the situation in which it would have found itself had Aksman's representations been true. Through Mr. Rauser's declaration, Greenwich has shown that it paid $174,707 to its litigation counsel and their experts (including the process server) through March 31, 2020, in an effort to remediate the effects of Aksman's fraud. These fees and costs are recoverable.

In addition, Greenwich seeks to recover an estimated $75,000 for its attorneys' services in connection with the arbitral hearing and other work-in-progress. Although there is no question that Greenwich has incurred additional legal expenses since March 31, this guesstimate is an insufficient basis upon which to award fees. The latter request is therefore denied.

Finally, Rule 24(f) of the JAMS Rules affords the arbitrator the discretion to "allocate the Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement." Here, the Agreement between the parties contains no such limitation. Accordingly, Greenwich will be awarded Arbitration fees and expenses, including Arbitrator compensation, in the amount of $18,795.58.

Thus, Greenwich will be awarded total compensatory damages in the amount of $3,280,982.58 ($3,087,480 + $174,707 + $18,795.58).

2.      Punitive Damages

"[C]ompensatory damages attempt to make the plaintiff whole  . . . , while punitive damages operate to punish the individual defendant and deter similar conduct by others."  Stephenson, 462 A.2d at 1077 (internal citations omitted).  Such punitive damages are appropriate where the fraud is "gross, oppressive, or aggravated, or where it involves breach of trust or confidence."  Id. at 1076.

As I suggested during the hearing, although punitive damages are rarely awarded, this case involves conduct so egregious that the damages award must address the need for deterrence and punishment.  Greenwich seeks an award of $3 million in punitive damages, but there is no indication that Aksman is someone with substantial ix```ndependent means. Accordingly, notwithstanding the brazenness of his conduct, I will limit the punitive damages aspect of the award to $750,000.

3.      Post-Award Interest

Greenwich also seeks to recover pre- and post-award interest until Aksman has satisfied the award.

Rule 24(g) of the JAMS Rules provides that an Arbitrator "may allocate . . . interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law."  The Agreement is silent with respect to an award of interest.  Accordingly, if interest is to be awarded, the source of the Arbitrator's authority to do so must be Delaware law.

In Duffy v. Cook, No. 16307-NC, 1998 WL 914267, at *3 (Del. Ch. Dec. 22, 1998), the court declined to modify an award to include post-award interest that had not been granted by the arbitral panel.  In doing so, the court recognized that a rule requiring a non-

prevailing party to pay post-award interest would encourage timely payment of an award, but explained that "the issues involved in considering whether or not to adopt such a rule and, if so, what rule to adopt, should either be addressed by the parties in structuring the terms of their arbitration agreement, by the General Assembly by way of amendment to the [Delaware Uniform Arbitration Act], or, in cases where the agreement to arbitrate is entered into as part of a court-sponsored alternative dispute resolution mechanism, by rule of that court.

Greenwich has failed to point to any provision of Delaware law that authorizes the imposition of either pre-award, or post-award/prejudgment interest in the absence of an express agreement by the parties to that effect. Accordingly, because the Agreement also is silent in this regard, I respectfully decline to award Greenwich any pre- or post-award interest.

V.      Award

For the foregoing reasons, respondent Michael Aksman is directed to pay claimant Greenwich Quantitative Research LP, within ten days, the sum of $4,030,982.58, consisting of lost profits in the amount of $3,087,480, punitive damages in the amount of $750.000, legal fees and expenses in the amount of $174,707, and arbitration fees and arbitrator compensation and expenses in the amount of $18,795.58.

SO ORDERED.

Dated:      New York, New York
            June 26, 2020

_____
            Frank Maas
            Arbitrator

I, Frank Maas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Arbitration Award.

_____        June 26, 2020
Frank Maas
Arbitrator

**PROOF OF SERVICE BY E-Mail**

Re: Greenwich Quantitative Research LP vs. Aksman, Michael
Reference No. 1425031204

I, Shakiya Wright-McDuffie, not a party to the within action, hereby declare that on  July 14, 2020, I served the attached Final Award on the parties in the within action by electronic mail at New York, NEW YORK, addressed as follows:

Mr. Paul C. Rauser                                            Mr., Michael Aksman
Serine Consolino Esq.                                       8 Kent Place
Aegis Law Group LLP                                       North Plainfield, NJ   07063
801 Pennsylvania Ave., N.W.                            Phone: 732-983-1086
Suite 740                                                           maksman123@gmail.com
Washington, DC   20004                                     Parties Represented:
Phone: 202-737-3500                                         Michael Aksman
prauser@aegislawgroup.com
sconsolino@aegislawgroup.com
   Parties Represented:
   Greenwich Quantitative Research LP

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW YORK on  July 14, 2020.

_____
Shakiya Wright-McDuffie
JAMS
swrightmcduffie@jamsadr.com