# Exhibit E

# Demand for Arbitration Form
## Instructions for Submittal of Arbitration to JAMS

---

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

---

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,500. For matters involving three or more parties, the filing fee is $2,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,500 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*

- *A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6**.

| | |
|---|---|
| **RESPONDENT NAME** | Michael Aksman |
| **ADDRESS** | 400 Washington Avenue |
| **CITY** | Martinsville    **STATE** NJ    **ZIP** 08836 |
| **PHONE** | (732) 983-1086    **FAX**    **EMAIL** maksman123@gmail.com |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Unknown |
| **FIRM/COMPANY** | |
| **ADDRESS** | |
| **CITY** | **STATE**    **ZIP** |
| **PHONE** | **FAX**    **EMAIL** |

## FROM CLAIMANT

Add more claimants on **page 7**.

| | |
|---|---|
| **CLAIMANT NAME** | Greenwich Quantitative Research LP |
| **ADDRESS** | 330 Railroad Avenue |
| **CITY** | Greenwich    **STATE** CT    **ZIP** 06830 |
| **PHONE** | (202) 489-6968    **FAX**    **EMAIL** greilly@greenwichquantitative.com |

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| **REPRESENTATIVE/ATTORNEY** | Paul C. Rauser, Serine Consolino |
| **FIRM/COMPANY** | Aegis Law Group LLP |
| **ADDRESS** | 801 Pennsylvania Ave. NW, Suite 740 |
| **CITY** | Washington    **STATE** DC    **ZIP** 20004 |
| **PHONE** | (202) 706-7031    **FAX**    **EMAIL** prauser@aegislawgroup.com; sconsolino@aegislawgroup.com |



# Demand for Arbitration Form (continued)
## Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐    If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

**CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION. A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.**

Please see Exhibit A attached.

**AMOUNT IN CONTROVERSY (US DOLLARS)**    **$9,100,000.00**



# Demand for Arbitration Form (continued)
Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. *Please cite location of arbitration provision and attach two copies of entire agreement.*

**ARBITRATION PROVISION LOCATION**

The arbitration provision is located at Section 8, pages 8-9, of the Parties' Restrictive Covenants Agreement.  The arbitration provision states:

(i) In consideration of Employee's employment or engagement with the Company, his promise to arbitrate all employment or service related disputes and Employee's receipt of the compensation and other benefits paid to Employee by the Company, at present and in the future, EMPLOYEE AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, STOCKHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. Employee agrees to arbitrate such disputes, and thereby agrees to waive any right to a trial by jury, including any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the New York State Labor Law, claims of harassment, discrimination or wrongful termination and any statutory claims. Employee further understands that this agreement to arbitrate also applies to any disputes that the Company may have with Employee.

(ii) Employee agrees that any arbitration will be administered by Judicial Arbitration & Mediation Services ("JAMS"), or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures and JAMS appellate procedures (such rules and procedures, the "Procedure") before a sole arbitrator who shall be a lawyer. Employee agrees that the arbitration will be conducted in New York, New York. Employee agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. Employee also agrees that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law and that any decision or judgment of the arbitrator will be enforceable in any court of competent jurisdiction. Employee agrees that the decision of the arbitrator shall be in writing and shall be binding upon Employee and the Company.

(iii) Except as provided by the Procedure and this Agreement (including, without limitation, Section 7 hereof) or any other agreement, plan or written policy to which you may be subject, arbitration shall be the sole, exclusive and final remedy for any dispute between Employee and the Company....

Two copies of the the entire agreement is attached.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. *Send the original response and counter-claim to the claimant at the address stated above with two copies to JAMS.*

## REQUEST FOR HEARING

**REQUESTED LOCATION**   JAMS New York Resolution Center

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
*See: Comprehensive Rule 16.1*

☐   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

**SIGNATURE**   _(signature)_

**DATE**   November 8, 2019

**NAME (PRINT/TYPED)**   Serine Consolino, Aegis Law Group LLP - Attorney for Claimant

 # Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

Completion of this section is **required for all consumer or employment claims**.

## CONSUMER AND EMPLOYMENT ARBITRATION

Please indicate if this is a CONSUMER ARBITRATION. For purposes of this designation, and whether this case will be administered in California or elsewhere, JAMS is guided by *California Rules of Court Ethics Standards for Neutral Arbitrators, Standard 2(d) and (e)*, as defined below, and the JAMS Consumer and Employment Minimum Standards of Procedural Fairness:

☐ **YES**, this is a CONSUMER ARBITRATION.

☑ **NO**, this **is not** a CONSUMER ARBITRATION.

"Consumer arbitration" means an arbitration conducted under a pre-dispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. "Consumer arbitration" excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

1.   The contract is with a consumer party, as defined in these standards;
2.   The contract was drafted by or on behalf of the non-consumer party; and
3.   The consumer party was required to accept the arbitration provision in the contract.

"Consumer party" is a party to an arbitration agreement who, in the context of that arbitration agreement, is any of the following:

1.   An individual who seeks or acquires, including by lease, any goods or services primarily for personal, family, or household purposes including, but not limited to, financial services, insurance, and other goods and services as defined in section 1761 of the Civil Code;
2.   An individual who is an enrollee, a subscriber, or insured in a health-care service plan within the meaning of section 1345 of the Health and Safety Code or health-care insurance plan within the meaning of section 106 of the Insurance Code;
3.   An individual with a medical malpractice claim that is subject to the arbitration agreement; or
4.   An employee or an applicant for employment in a dispute arising out of or relating to the employee's employment or the applicant's prospective employment that is subject to the arbitration agreement.

In addition, JAMS is guided by its Consumer Minimum Standards and Employment Minimum Standards when determining whether a matter is a consumer matter.

**If Respondent disagrees with the assertion of Claimant regarding whether this IS or IS NOT a CONSUMER ARBITRATION, Respondent should communicate this objection in writing to the JAMS Case Manager and Claimant within seven (7) calendar days of service of the Demand for Arbitration.**

## EMPLOYMENT MATTERS

If this is an EMPLOYMENT matter, Claimant must complete the following information:

Private arbitration companies are required to collect and publish certain information at least quarterly, and make it available to the public in a computer-searchable format. In employment cases, this includes the amount of the employee's annual wage. The employee's name will not appear in the database, but the employer's name will be published. Please check the applicable box below:

☐ Less than $100,000      ☐ $100,000 to $250,000      ☐ More than $250,000      ☑ Decline to State

## WAIVER OF ARBITRATION FEES

In certain states (e.g. California), the law provides that consumers (as defined above) with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees. In those cases, the respondent must pay 100% of the fees. Consumers must submit a declaration under oath stating the consumer's monthly income and the number of persons living in his or her household. Please contact JAMS at 1-800-352-5267 for further information. Note: this requirement is not applicable in all states.

 # Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## RESPONDENT #2 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY | | STATE | ZIP |
| PHONE | FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|
| FIRM/ COMPANY | | | |
| ADDRESS | | | |
| CITY | | STATE | ZIP |
| PHONE | FAX | EMAIL | |

## RESPONDENT #3 (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

| RESPONDENT NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY | | STATE | ZIP |
| PHONE | FAX | EMAIL | |

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| REPRESENTATIVE/ATTORNEY | | | |
|---|---|---|---|
| FIRM/ COMPANY | | | |
| ADDRESS | | | |
| CITY | | STATE | ZIP |
| PHONE | FAX | EMAIL | |



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## CLAIMANT #2

CLAIMANT NAME

ADDRESS

CITY                              STATE              ZIP

PHONE              FAX              EMAIL

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                              STATE              ZIP

PHONE              FAX              EMAIL

## CLAIMANT #3

CLAIMANT NAME

ADDRESS

CITY                              STATE              ZIP

PHONE              FAX              EMAIL

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

REPRESENTATIVE/ATTORNEY

FIRM/ COMPANY

ADDRESS

CITY                              STATE              ZIP

PHONE              FAX              EMAIL

Paul C. Rauser (prauser@aegislawgroup.com)
Serine Consolino (sconsolino@aegislawgroup.com)
AEGIS LAW GROUP LLP
801 Pennsylvania Ave. NW, Suite 740
Washington, D.C.
Telephone: (202) 737-3375

*Attorneys for Claimant*

---

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

| | |
|---|---|
| GREENWICH QUANTITATIVE RESEARCH LP, <br><br> Claimant; <br><br> vs. <br><br> MICHAEL AKSMAN, <br><br> Respondent. | **EXHIBT A** <br><br> **DEMAND FOR ARBITRATION** |

Claimant Greenwich Quantitative Research LP ("Greenwich" or "the firm"), by and through its attorneys, brings this Demand for Arbitration against Respondent Michael Aksman, Greenwich's Senior Portfolio Manager. This case arises out of Akman's two-year-long fraud against Greenwich, in which Aksman repeatedly deceived Greenwich about his resume and track record, and falsified return summaries for an equity investment account he claims to have managed—but which, as it appears, does not actually exist.

### NATURE OF THE DISPUTE

In August 2017, Greenwich—then a newly-formed asset management firm—hired Michael Aksman to be its new portfolio manager, relying on Aksman's representation that he was the fund manager for a $10 million equity account housed at the brokerage firm Wedbush Securities LLC (the "Wedbush account"). Over the ensuing months, Aksman regularly emailed "Equity Summary

Reports" to Greenwich—purportedly reflecting the equity positions in the Wedbush account—and repeatedly made representations to Greenwich about the strategy, status, and track record of the Wedbush account.  In turn, Greenwich relied on Aksman's representations to develop a trading strategy and market itself to potential investors.

In fact, Akman's representations about the Wedbush account were entirely a ruse. Greenwich has recently learned that Aksman does not manage *any* equity account at Wedbush, and may never have.  Over and over again, Aksman lied to Greenwich about the existence of the Wedbush account, and submitted falsified return summaries to Greenwich—causing Greenwich to lose two years' worth of work, and millions of dollars, developing and marketing fund based upon Akman's fictious equity account.

## <u>THE PARTIES' AGREEMENT TO ARBITRATE THIS DISPUTE</u>

The parties' Restrictive Covenant Agreement ("RCA") executed on or about March 7, 2019, and signed by both Aksman and Greenwich, governs this dispute and contains the parties' explicit agreement to arbitrate.  The RCA's arbitration clause provides:

> (b) <u>Arbitration</u>.
>
> (i) In consideration of Employee's employment or engagement with the Company, his promise to arbitrate all employment or service related disputes and Employee's receipt of the compensation and other benefits paid to Employee by the Company, at present and in the future, EMPLOYEE AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, STOCKHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. Employee agrees to arbitrate such disputes, and thereby agrees to waive any right to a trial by jury, including any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the

Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the New York State Labor Law, claims of harassment, discrimination or wrongful termination and any statutory claims. **Employee further understands that this agreement to arbitrate also applies to any disputes that the Company may have with Employee.**

(ii) Employee agrees that any arbitration will be administered by Judicial Arbitration & Mediation Services ("JAMS"), or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures and JAMS appellate procedures (such rules and procedures, the "Procedure") before a sole arbitrator who shall be a lawyer. Employee agrees that the arbitration will be conducted in New York, New York. Employee agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. Employee also agrees that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law and that any decision or judgment of the arbitrator will be enforceable in any court of competent jurisdiction. Employee agrees that the decision of the arbitrator shall be in writing and shall be binding upon Employee and the Company.

(iii) Except as provided by the Procedure and this Agreement (including, without limitation, Section 7 hereof) or any other agreement, plan or written policy to which you may be subject, arbitration shall be the sole, exclusive and final remedy for any dispute between Employee and the Company. Accordingly, except as provided for by the Procedure and this Agreement (including, without limitation, Section 7 hereof) or any other agreement, plan or written policy to which you may be subject, neither Employee nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration. Notwithstanding the foregoing, the arbitrator will not have the authority to disregard or refuse to enforce any lawful policy of the Company, and the arbitrator shall not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.

(emphasis added).  Because the arbitration clause in the RCA provides that the agreement to arbitrate applies to "any disputes that the Company may have with Employee," the arbitration clause in the RCA governs this dispute.

The March 7, 2019 RCA supersedes an RCA executed by Aksman and Greenwich on or about October 24, 2017, which contained an identical arbitration clause.

## FACTUAL BACKGROUND

1.     Claimant Greenwich Quantitative Research LP is Delaware asset management firm specializing in the quantitative trading of global equities.  It was founded in April 2017 by Gene Reilly, a 27-year veteran of the finance industry, who currently serves as the firm's Chief Investment Officer.

### Greenwich Interviews and Hires Michael Aksman As Portfolio Manager

2.     In the summer of 2017, Greenwich began the search for a Senior Portfolio Manager for the newly-formed firm.  In July 2017, Michael Aksman applied for the position, and interviewed with Gene Reilly.  During the interview process, Aksman represented to Reilly that his equity investment firm, Equities Global Analytics LLC ("EGA"), was currently managing a $10 million equity account for an individual named Stefano Brocco, a partner at the global quantitative hedge fund A.R.T. Advisors LLC.  Aksman further stated that the brokerage firm Wedbush Securities LLC was serving as the prime broker for the account.

3.     Aksman's track record managing the Wedbush account was an essential component of his application for the position: as is typical in asset management, Greenwich intended not only to market the success of its portfolio manager to potential investors, but also to replicate Aksman's trading strategy for the Wedbush account.

4.     On or about August 25, 2017, Aksman provided Reilly with what purported to be a current "Equity Summary Report" for the Wedbush account, in order for Greenwich to evaluate Aksman's prior track record and success.  The Equity Summary Report had a "Wedbush" header, and listed the amount of capital in the account, the number of shares, and the account's daily trading P&L numbers from January 2015 through July 2017—which indicated highly favorable

returns.  Aksman explained that he could not provide Greenwich with Wedbush account statements to Greenwich because of confidentiality obligations to Brocco.

5.      To further verify Aksman's representations about the Wedbush account, Reilly requested that Aksman additionally provide (1) his individual tax returns for 2015 and 2016, and (2) the investment advisory agreement between EGA and Brocco.  Aksman  duly provided both.

6.      Greenwich reviewed and reconciled Akman's tax returns against the income he would be expected to receive from managing the Wedbush account based on the terms of the investment advisory agreement with Brocco.  After an extensive interview process, Reilly decided to hire Aksman as Senior Portfolio Manager for Greenwich, based predominately upon Akman's impressive purported track record managing the Wedbush account.

7.      On or about October 24, 2017, Aksman and Greenwich executed the RCA, which set forth certain conditions of Aksman's employment.  On or about March 7, 2019, Aksman and Greenwich executed a revised RCA, which modified and superseded the original agreements.

**Aksman Repeatedly Represents That EGA Manages an Account at Wedbush**

8.      In the fall of 2017, Greenwich began the process of marketing its fund to potential investors.  Greenwich initially anticipated a March 2018 fund launch; however, the fund launch was subsequently delayed until September 2019 in order to raise additional investor capital.

9.      Aksman's track record was the lynchpin of that effort.  Aksman regularly provided "Equity Summary Reports," purportedly from the Wedbush account, to Greenwich.  Greenwich, in turn, provided the return summaries from these reports to each of its potential investors. Greenwich represented that the return summaries reflected an actual equity account currently managed by its Senior Portfolio Manager, and that it would deploy the trading strategy used to

generate the returns in that account in its own fund.  All told, Greenwich sent the return summaries based on the Wedbush account to nearly 70 potential investors.

10.     Greenwich also spent considerable time and effort researching and developing trading systems specifically designed to be compatible with Akman's trading strategy, including an order management system, an execution management system, risk system solutions, and reconciliation system solutions.

11.     Aksman was not only aware that that Greenwich was using purported return summaries from the Wedbush account to pitch to investors, but he often actively participated in investor meetings and phone calls in which these pitches occurred.

12.     Throughout 2018 and well into 2019, Aksman repeatedly verified the authenticity of the Wedbush account both orally and in extensive email correspondence with Reilly and other Greenwich representatives, and continued to verify the existence of the Wedbush account in other ways.

13.     For example, on October 29, 2018, Reilly emailed Aksman requesting "an update on how performance [in the Wedbush account] looks through today for October MTD."  In that email, Reilly noted that "[q]uite a few quant products are struggling and [we] would like to clarify how you are doing."  Aksman replied, attaching what purported to be a Wedbush account Equity Summary Report through October 2018, and noting that the Wedbush account had a "[s]omewhat positive total return" for October.

14.     Similarly, on November 27, 2018, Reilly emailed Aksman to request the "MTD [results] for November as it may come up in the meeting [with potential investors].  Please check the numbers through yesterday and also please do let me know."  The following day, Aksman sent Reilly what purported to be a Wedbush account Equity Summary through November 2018.

15.     On December 3, 2018, Ian Clay—Greenwich's Chief Financial Officer and International COO—emailed Aksman, noting a discrepancy he had observed in the most recent Wedbush account Equity Summary Report: "For Thurs / Fri, the daily PL doesn't appear to match the corresponding increases / decreases in equity," Clay wrote.  "Would you be able to have a look at it for us please?"  Aksman explained that the discrepancy was due to the fact that "Wedbush does all the corrections on [] business days."

16.     On June 4, 2019, Aksman again sent Reilly what purported to be an up-to-date Equity Summary Report for the Wedbush account, noting that "May turned up slightly positive after all."

17.     On June 11, 2019, Clay emailed Aksman to inquire about the account's leverage. Clay noted, "The current Wedbush account has ~$20mm of equity and ~$60mm of GMV.  I think in the early days you were running a much higher leverage.  [Is] Wedbush imposing constraints on you to keep you at ~3x or could you take it higher if you wanted to?"  Aksman replied, "Leverage is our investor['s] decision.  ART Advisors LLC [] imposed 60M GMV limit with EGA on [Brocco] as a condition of keeping the rest of his money in their fund without charges.  Wedbush gives regular maximum 6.67x1 leverage."

18.     On June 27, 2019, Reilly emailed Aksman asking for "the results MTD" because "[a] few investors are asking for indicative June results."  In response, Aksman emailed Reilly what purported to be a Wedbush account Equity Summary Report through June 26, 2019.

19.     On July 19, 2019, Aksman, Reilly, Greenwich's Chief Risk Officer Dylan Halterlein, and Greenwich's Head of Operations and U.S. COO Anthony Kwiatkowski met with Morgan Stanley's Investment Management team.  The purpose of that meeting was to market the fund to Morgan Stanley.  At that meeting, Aksman represented to the Morgan Stanley team that

the return summaries presented to them reflected an equity account that he currently managed for a partner at A.R.T. Advisors LLC; the Morgan Stanley team was impressed.

20.     On August 6, 2019, Reilly emailed Aksman to inquire about the July results for the Wedbush account.  Aksman replied, "[s]low summer trading. Very low liquidity and volatility in July.  Nothing to arbitrage."  Then, on August 16, 2019, Aksman sent Reilly what purported to be a Wedbush account Equity Summary Report through August 15, 2019.

### Greenwich Uncovers Aksman's Fraud

21.     In July 2019—as Greenwich was preparing for a September 2019 fund launch— James Alpha Management LLC ("James Alpha"), an asset management firm retained by Greenwich to assist with marketing the fund, elected to open a $10 million managed account with Greenwich to create an audited track record Greenwich could then use to market to other investors. Reilly decided to use Wedbush as the prime broker for that account because of its pre-existing relationship with Aksman, and so Reilly contacted Wedbush to begin the process of setting up James Alpha's managed account.

22.     At approximately noon on September 10, 2019, Reilly, Clay, and Kwiatkowski participated in a conference call with Sean Trager, a Wedbush Vice President, to discuss setting up a managed account for James Alpha at Wedbush.

23.     On that call, Reilly explained to Trager that Greenwich sought to mimic the terms of a managed account currently maintained by Michael Aksman at Wedbush.  Trager replied that he could not see any accounts in his system matching the given description of EGA's Wedbush account.

24.     Alarmed by Trager's statement, at approximately 1:15 pm—immediately following the conference call with Trager—Clay called Aksman to request the Wedbush account number.

Aksman refused to disclose the Wedbush account number, citing confidentiality obligations to Brocco.

25.     At approximately 1:40 pm, Reilly then called Trager again, who, to Reilly's shock, confirmed that EGA did not manage any account for Stefano Brocco at Wedbush.

26.     At approximately 1:53 pm, Reilly called Aksman, demanding an explanation. Aksman insisted that Trager was mistaken, and suggested that perhaps Trager did not have access to EGA's Wedbush account.

27.     Later that evening, Reilly emailed Aksman, stating, "I still need to get back to James Alpha with a definitive answer on who is acting as PB for the account upon which the simulated returns are based."  Aksman refused to budge, insisting that "Wedbush is PB for the Stefano account.   Sean [Trager] could be prohibited from discussing details of his client's account."

28.     Reilly then implored Aksman to "[p]lease think of a way of verifying that you are in fact managing a long / short overnight account at Wedbush.   No other details need to be disclosed.   Obviously, it's a fair question based on how the call went."  Aksman replied, "I don't want to prove anything . . . if [James Alpha] can't live with that, we can move forward to other opportunities."

29.     In the days following the September 10 call with Trager, Aksman was adamant that EGA managed an active account for Brocco at Wedbush.   On September 12, Aksman emailed Reilly that he had requested from Trager "[c]onfirmation that the account is there but he can't discuss any details due to confidentiality."

30.     On September 18, Reilly emailed Aksman to request additional verification of the Wedbush account, as well as official IRS transcripts for Aksman's 2015, 2016, and 2017 tax returns.  Aksman did not respond.

31.     On September 23, 2019, Aksman sent Reilly an email, supposedly relaying a conversation between himself and Brocco.  "I just called Stefano to get indirectly his opinion about current account legal status," Aksman explained.  "He feels that this is his exclusive investment with me . . . I can't use any account information in marketing my strategy to investors."  Aksman continued, "Stefano may write me some email to that effect.  Hope we can all move forward."

32.     That same day, Aksman emailed Trager, demanding that Trager "stop making comments about [the] account and just say 'no comment.'"  Trager replied, "You know full and well that there is no 'active account here' and that more specifically there is no cash on deposit (nor positions). . . Your story is largely fictitious."  Trager then forwarded the exchange to James Alpha, who in turn forwarded it to Greenwich.

33.     On September 25, Aksman emailed Reilly, informing him that Brocco had closed the Wedbush account. Aksman swiftly blamed Wedbush for Brocco's decision, referring to Wedbush as "troublemakers": "Stefano got [] wind of that controversy from Wedbush and closed [the] account recently," Aksman wrote to Reilly.  "Maybe Alpha should close [the] account at Wedbush as Wedbush are troublemaker[s]."  Aksman then suggested that James Alpha should abandon its Wedbush account.

34.     Reilly immediately followed up with Aksman, requesting—several times—the date of the Wedbush account closure.  Aksman did not respond.

35.     On September 27, 2019, Reilly and Halterlein convened a conference call with Aksman.  Reilly explained that Trager's allegations that there is no managed account at Wedbush

for Brocco were very serious, and needed to be refuted immediately.  Aksman stated that the Wedbush account had just been closed the previous week, and again insisted that his confidentiality obligations to Brocco precluded him from disclosing any further information about the account.  On that call, Aksman was hostile and defensive, and repeatedly dismissed Trager as an "idiot" and "unpredictable."

36.     On October 1, 2019, Reilly sent Aksman a letter renewing his request for (1) official IRS transcripts of Aksman's 2015-2017 tax returns, and (2) copies of Stefano Brocco's Wedbush account statements for 2017 to the present.  To date, Aksman has not provided Greenwich with either set of documents.

37.     On October 3, 2019, Reilly and Clay convened another conference call with Aksman.  In stunning about-face, Aksman admitted that EGA had not traded in the Wedbush account "for a while."  Reilly asked when the account was closed, and Aksman replied that it had been closed more than a year ago.  Reilly then asked Aksman to provide the exact date that the account was closed, as well as account statements from the period of time when the account was active.  Aksman stated he would "work on it."

38.     On October 12, 2019, Aksman, in an email to Reilly, stated that EGA had "stopped trading [in the Wedbush account] **at the end of 2018** and we currently don't have any access to our trading account." (emphasis added).

39.     Upon information and belief, the 2015 and 2016 tax returns Aksman provided to Greenwich during his interview were falsified.

40.     To date, Aksman has not provided Greenwich with any additional corroboration to confirm the existence of the Wedbush account.  Because of Aksman's repeated falsehoods, evasiveness, and ongoing failure to provide corroborating documentation, Greenwich must

conclude that, in all likelihood, EGA has not managed any account at all for Stefano Brocco since he came into Greenwich's employ.

41.     Overnight, Greenwich has seen two years' worth of work vanish.  The firm has spent thousands of hours developing and marketing a fund based upon Akman's purported trading strategy, all of which is now worthless.  Continuing to market its current fund strategy—largely based on statements now believed to be false—could expose Greenwich to catastrophic legal and reputational risk.  Greenwich must therefore recreate its entire fund strategy from scratch, and then market itself anew to each of its investors.  Aksman's deception has thus cost Greenwich hundreds of thousands of dollars' worth of employee time, as well as legal fees associated with negotiating and preparing Aksman's employment agreements.  Moreover, re-developing and raising capital for an entirely new fund strategy is a process that is likely to take, at a minimum, another twelve months—delaying the fund's launch for at least that amount of time, and causing Greenwich to lose an additional $2,900,000 in projected lost profits.

## FIRST CAUSE OF ACTION
### (Fraud)

42.     Greenwich incorporates all preceding paragraphs as if set forth expressly herein.

43.     Aksman repeatedly represented to Greenwich that EGA was actively managing a $10 million equity account for Stefano Brocco at Wedbush with highly favorable returns.  Aksman continued to make representations about the Wedbush account throughout the parties' relationship, and regularly provided Greenwich with return information for the Wedbush account for Greenwich to market to its potential investors.

44.     Greenwich relied on Aksman's representations to hire Aksman as Senior Portfolio Manager, and thereafter spend nearly two years developing and marketing a fund built entirely around the strategy EGA purportedly used to trade in the Wedbush account.

45.     Aksman's representations regarding the Wedbush account were false.  As early as December 2018, and possibly even earlier, EGA did not manage any account for Stefano Brocco at Wedbush.

46.     As early as December 2018, and possibly even earlier, the purported "Equity Summary Reports" Aksman sent to Greenwich were fictitious.

47.     Aksman knew that these representations were false, and also knew that Greenwich was using his false representations to market its fund to potential investors.  Aksman made these false representations to Greenwich to induce Greenwich to hire him as Senior Portfolio Manager.

48.     Greenwich reasonably relied on Aksman's representations regarding the Wedbush account.  Greenwich made efforts to verify the existence of the Wedbush account by reviewing and reconciling Akman's tax returns against the income he would be expected to receive from managing the Wedbush account based on the terms of the investment advisory agreement with Brocco, but otherwise had no ability to independently discover the falsity of Aksman's representations, as Aksman refused to disclose the Wedbush account statements to Greenwich. Upon information and belief, the 2015 and 2016 tax returns Aksman provided to Greenwich were falsified.

49.     Aksman's fraudulent misrepresentations have harmed Greenwich: because Greenwich must now recreate and re-market its entire fund strategy, Greenwich has lost at least $1,200,000 in employee time, legal fees, and other expenses, as well as at least $2,900,000 in projected lost profits resulting from the delayed fund launch.

50.     In addition to compensatory and lost profits damages, Greenwich should be awarded punitive damages against Aksman in an amount to be proven at trial, but in no event less

than $5 million, because his wrongful conduct toward Greenwich has been outrageous, grossly

fraudulent, and reckless, and evinces a high degree of moral turpitude.

## **REMEDIES SOUGHT**

WHEREFORE**,** Greenwich requests a final decision of the Arbitrator finding in favor of

Greenwich on its claim for fraud and awarding Greenwich:

a. Compensatory damages in an amount to be proven at the hearing, but in no event less than $1,200,000;

b. Lost profit damages in an amount to be proven at the hearing, but no in no event less than $2,900,000;

c. Punitive damages in an amount to be proven at the hearing, but in no event less than $5,000,000;

d. Greenwich's reasonable attorneys' fees and costs associated with this arbitration proceeding;

e. Pre-judgment interest at the maximum rate established by law; and

f. Such other relief as the Arbitrator deems just and appropriate.

Dated:  November 8, 2019                              Respectfully submitted,

AEGIS LAW GROUP LLP


/s/ Paul C. Rauser
Paul C. Rauser
Serine Consolino

*Attorneys for Claimant*

- 14 -