# Exhibit D



March 7, 2019

Dear Michael,

Greenwich Quantitative Research LP (the "Company") is an asset management firm specializing in the quantitative trading of global equities (the "Business"). Its vision is to develop and utilize technological innovations that analyze data in order to deliver superior investment returns. Its team has been carefully selected for their best-in-class performance and demonstrated expertise across a number of diverse disciplines. Overall, its management team has a deep interest in its overall financial performance, developing its people and providing a rewarding career and managing its risk and reputation.

Following our recent discussions, I am pleased to offer you (sometimes referred to as "Employee" below) employment as Senior U.S. Portfolio Manager on the terms set out below. This agreement supersedes in all respects the previous offer letter between you and the Company dated October 24th, 2017, as extended most recently by the letter agreement between you and the Company dated January 28, 2019.

This agreement in all circumstances shall be subject to the Company raising sufficient investor capital to support a minimum of $250,000,000 Gross Market Value ("GMV") in trading positions ("the Capital Raise") as of June 30, 2019 (the "Closing Date"). Unless otherwise agreed to by the parties in writing, if the Company does not raise sufficient investor capital noted above by the Closing Date, this agreement shall be void.

<u>Position and Location</u>

The Company will notify you of the date of the Capital Raise (the "Notice"). While this agreement is effective as of the date of hereof, your employment with the Company shall only commence upon your "Start Date," which will be the date set forth in the Notice. Your Start Date will be no later than the earlier of: 10 business days following your receipt of the Notice; or June 30, 2019. From your Start Date you will render your services to the Company, and you will perform such duties and responsibilities as may be designated by the Company from time to time, commensurate with your title and position. You agree to devote substantially all of your business time and attention to the Company and its affiliates, the promotion of the interests of the Company and its affiliates, and the performance of your duties and responsibilities. You further agree that on your Start Date you shall contribute such intellectual property, including relevant source code, that is relevant to your employment with the Company and the trading of your Trading Book (as defined below).

Your principal place of employment will be at the Company's offices in the New York, New York area.

*Allocated Capital*

The Company will allocate $250,000,000 GMV to your trading book ("Trading Book") for the purposes of your management of trading strategies that are approved by the Company's Chief Investment Officer ("CIO") and Chief Risk Officer ("CRO") in their discretion. We expect that your Trading Book will comprise of a well-hedged portfolio of equities, ETFs and equity index futures contracts. The committed minimum investment is based upon our clearing firm providing an industry standard amount of leverage for a Trading Book that confirms to the normal aggregate risk characteristics of similar strategies.

*Trading Team*

In support of your Trading Book the Company will provide you with the capacity to hire Eugene Belozersky as an employee of the Company to be supervised by you and to engage Leon Aksman as a consultant to the Company (together with you, the "Trading Team") capped at an aggregate annual base salary of $350,000. The employment or engagement by the Company of each member of your trading team shall be conditioned upon such member's execution of relevant agreements, including as applicable, an employment agreement consultancy or other relevant engagement agreement, and a restrictive covenant agreement, as well as such member's consent to, and results satisfactory to the Company of, reference and/or background checks. Each member of the Trading Team's base salary will be reviewed at the Company's discretion on an annual basis.

*Compensation*

Our compensation philosophy is based on delivering highly competitive compensation and benefits to attract and retain top talent and to encourage a focus on the long-term growth of the Business.

   *Base Salary*

Your initial base salary will be at the rate of $250,000 per annum (the "Base Salary"), payable in accordance with Company standard payroll practices in effect at the time of payment and subject to applicable tax withholding. Your Base Salary will be paid semi-monthly, with your first Base Salary payment made in respect of the period from the Start Date through the payment date. The Base Salary will be reviewed at the Company's discretion on an annual basis.

   *Revenue Sharing*

You and your Trading Team will be eligible for an aggregate special incentive bonus ("Revenue Bonus"), less applicable tax withholding, determined based on a percentage of the annual Adjusted Incentive Revenues (defined below) that you generate. The percentage will be determined as follows:

- A Sharpe ratio equal to and greater than 3: 60%
- A Sharpe ratio equal to and greater than 2 but less than 3: 50%
- A Sharpe ratio less than 2: 40%

The Revenue Bonus will be payable as a lump sum cash payment to you and each member of your Trading Team in the fiscal year following the fiscal year for which the Revenue Bonus is attributable, and in all events not later than the 60th day following the end of the fiscal year for

which the Revenue Bonus is attributable (currently the Company's fiscal year ends December 31st). Payment of any Revenue Bonus will be subject to you and each member of your Trading Team remaining employed through the payment date.

"Adjusted Incentive Revenues" for any applicable fiscal year means the U.S. dollar value of the total incentive revenues generated by you and your Trading Team for such fiscal year.

Any Revenue Bonus payable to you and your Trading Team shall be reduced by (i) the aggregate base salary paid to you and your Trading Team for such fiscal year, and (ii) the aggregate overhead expenses of the Company allocable to you and your Trading Team. The calculation and determination of the Adjusted Incentive Revenues and Revenue Bonus, including any adjustments for extraordinary items or nonrecurring events, will be determined by the Company in its sole discretion.

### Equity Profit Participation Plan

Additionally, you will be eligible to participate in the Company's Equity Profit Participation Plan (the "Plan"). Participation in the Plan will be subject to you managing a minimum of 40% of the Company's GMV and generating a minimum 4% return on long GMV and maintaining a minimum Sharpe ratio of 2.5. The Plan will represent a 30% interest in the net income of the Company (the "Net Income Interest") allocable as follows: (i) a 12.5% Net Income Interest shall be allocated to you on your Start Date if all members of your Trading Team are also employed or engaged, as applicable, by the Company as of your Start Date; (ii) a 2.5% Net Income Interest shall be allocated to Eugene Belozersky on your Start Date if all members of the Trading Team are employed or engaged, as applicable, by the Company as of your Start Date; and (iii) the remaining portion of the 30% total Net Income Interest (i.e., either 15% or the full 30% if each member of your Trading Team is not employed by the Company on your Start Date) shall be allocable to you and Eugene Belozersky on a jump ball basis over two years, with Eugene Belozersky to be allocated 16.66% of the portion of the Net Income Interest so allocated and the remainder of such portion to be allocated to you. Additionally, the Company will provide you with the capacity to reallocate to the other members of the Trading Team the portion of your Net Income Interest that is allocable to you on a jump ball basis over two years. The terms of the Plan will be provided to you at a later date.

### Discretionary Bonus

You will also be eligible to participate in the Company's annual bonus plan. The amount of any annual bonus payable to you will be determined by the Company in its sole discretion, based on your performance and the performance of the Business. Payment of any annual bonus will be subject to your remaining employed through the payment date.

### Employee Benefits

You will be eligible to participate in the Company's health, welfare, vacation and other benefit plans from time to time in effect for similarly situated employees of the Company generally. Your participation in such benefit plans will be subject to the terms of the applicable plan documents and the Company's generally applicable policies. Nothing in this agreement is intended, or shall be construed, to require the Company or its affiliates to institute or continue any particular benefit plan or arrangement, and such benefit plans or arrangements may be changed, terminated or reduced from time to time, in the sole discretion of the Company.

## *Termination*

Please note that your employment with the Company is on an "at will" basis. That means that you may terminate your employment at any time, for any or no reason, and the Company reserves the same right. Nothing in this offer is intended to create a contract for employment, guarantee of continued employment with the Company, or guarantee of any particular compensation or benefit level.

If the Company terminates your employment other than due to your death or disability (within the meaning of the Company's long-term disability plan as in effect from time to time) and other than due to Cause, the Company shall provide you not less than 90 days' advanced written notice prior to the effective date of such termination. Notwithstanding the foregoing, the Company may in its discretion elect to accelerate the termination date and waive such period of notice or any portion thereof, but in case of such acceleration and waiver you shall receive continued payments of your Base Salary until the 90th day following the date the Company first delivered its notice of termination. For the avoidance of doubt, the Company may terminate your employment for Cause without notice.

As used herein, "Cause" means a finding by the Company in good faith of: (a) your material breach of this agreement or Restrictive Covenant Agreement, (b) your negligence or willful misconduct, or willful failure to attempt in good faith to substantially perform your duties (other than due to physical illness or incapacity), (c) your conviction of, or plea of guilty or nolo contendere to, or confession to, (i) a misdemeanor involving moral turpitude or (ii) a felony (or the equivalent of a misdemeanor involving moral turpitude or felony in a jurisdiction other than the United States), (d) your fraud or misappropriation, embezzlement or material misuse of funds or property belonging to the Company, (e) willful or reckless misconduct which results in or could reasonably be expected to result in material damage to the property, business or reputation of the Company or (f) a determination by the Company (in its sole discretion) that you are unable to perform the services contemplated by this agreement to the satisfaction of the Company.

Any payments made pursuant to this agreement are intended to comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), and this agreement shall be construed with such intent. Any such payments, to the extent subject to Section 409A, shall be treated as separate payments for purposes of Section 409A.

If you resign from your employment for any reason, you shall provide the Company not less than 90 days' advanced written notice prior to the effective date of such resignation. Notwithstanding the foregoing, the Company may in its discretion elect to accelerate the termination date and waive such period of notice or any portion thereof and will not be required to pay you for the 90-day notice period.

During any applicable notice period (whether due to a termination by the Company or by you, as described above), the Company at its discretion may implement a "garden leave" period during which you will not be required to report to the Company's offices, but shall be required to be available remotely. During any such garden leave, you will remain a Company employee, and you agree to cooperate reasonably in the transition of your duties to other Company personnel and remain bound by all of your duties and obligations to the Company, including, without limitation, the obligations stated in the Restrictive Covenant Agreement and the duties and obligations applicable to you under common law.

### Liquidated Damages

Provided the Company raises the investor capital noted above by the Closing Date (or such other agreed upon date by the parties), the Employee expressly acknowledges and agrees that, in the event the Employee breaches this Agreement by not providing his services to the Company on the agreed upon Start Date, proof of the Company's total loss and/or the calculation of its total momentary damages will be difficult to determine. Employee expressly agrees that, because of factors unique to the financial services industry, liquidated damages alone cannot fully compensate the Company for all possible harm it will suffer as a result of a breach of this Agreement. Employee, however, expressly agrees that in the event of a breach, the Company and its Affiliates shall be entitled to relief that includes, but is not limited to, liquidated damages as provided herein. Employee expressly acknowledges and agrees that the following liquidated damages amounts are reasonable in light of the anticipated or actual immediate monetary harm that will be caused by such breach of this Agreement and are not a penalty. Employee further acknowledges and expressly agrees that the following liquidated damages constitute a good faith estimate of actual immediate monetary damages that will probably ensue to the Company and its Affiliates as the result of a breach. With the foregoing in mind, Employee acknowledges and agrees that, in the event of his breach of this agreement by Employee not working for the Company as of the Start Date, the Company and its Affiliates shall be entitled to liquidated damages in an amount equal to $170,000.

### Other Terms and Conditions

As consideration for your employment and the other consideration set forth in this agreement, you agree to execute and deliver to the Company the Restrictive Covenant Agreement, which has been separately provided to you. Your employment is conditioned upon your execution of this agreement and the Restrictive Covenant Agreement, your contribution of the Prior Works on the Start Date, as well as your consent to, and results satisfactory to the Company of, reference and/or background checks.

In addition, in accordance with U.S. federal law, you will be required to provide documentation verifying your employment eligibility within 72 hours of your commencement of employment with the Company.

As an employee of the Company, your continued service (and receipt of compensation hereunder) will be subject to your continued employment in good standing which will include, among other things, your adherence to all applicable laws and the Company's policies and procedures and other applicable compliance manuals currently in existence or that may be adopted in the future, copies of which will be separately made available to you. You agree to execute any customary forms and agreements in connection with the foregoing.

* * * * *

This agreement will be governed by and interpreted in accordance with the laws of the State of Delaware, without regard to its principles of conflict of laws. This agreement may not be amended except in writing and signed by an authorized agent of the Company and yourself.

In accepting this offer, you acknowledge that this agreement constitutes the entire understanding of your employment with the Company and that any previous or current agreements, discussions, negotiations, or understandings that are not set forth in this

agreement are superseded. In the event that any one or more of the provisions of this agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this agreement shall not be affected thereby.

Please sign a copy of this agreement as indicated below and return the signed copy to me. If you have any questions concerning this agreement, please contact me at (203) 489-6986.

I believe that you will be an important member of the team and. I am excited to present you with this opportunity. I hope you will join us as we move forward with the Business.

Sincerely,

GREENWICH QUANTITATIVE RESEARCH LP

By: *[signature]*

Gene Reilly
Chief Investment Officer

Acknowledged and Agreed:

*[signature]*
Michael Aksman

3/8/19