UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL AKSMAN,

                                        Petitioner,

                    -v-

GREENWICH QUANTITATIVE RESEARCH LP,

                                        Respondent.

------------------------------------------------------------------------

GREENWICH QUANTITATIVE RESEARCH LP,

                                        Cross-Petitioner,

                    -v-

MICHAEL AKSMAN,

                                        Cross-Respondent.

---

20 Civ. 8045 (PAE)

**PAUL A. ENGELMAYER, District Judge:**

This decision resolves competing motions arising out of a more than $4 million arbitral award (the "Award"). The Award was entered in favor of an asset management firm, Greenwich Quantative Research LP ("Greenwich"), against Michael Aksman ("Aksman"), whom it hired as a senior portfolio manager but whom it later accused of fraud. Aksman, who did not participate in the arbitration, has petitioned to vacate the Award. He argues that he was not served with notice of the arbitration, and that the parties' agreement containing a mandatory arbitration clause was void and ineffective at the time of arbitration. Greenwich opposes that petition and has cross-petitioned to confirm the Award. For the following reasons, the Court denies Aksman's petition to vacate the Award and grants Greenwich's cross-petition to confirm it.

## I.     Background

### A.     Factual Background[1]

#### 1.     Events Preceding the Arbitration

Greenwich is a Delaware-based asset management firm that specializes in trading global equities. Award at 1. In 2017, Greenwich hired Aksman through a recruiter to be the senior portfolio manager for a new fund, which Greenwich planned to launch in late 2019. *Id.*; *see also id.* at 4. Aksman's credentials, as presented to Greenwich, included a master's degree in Computational Mathematics from the Massachusetts Institute of Technology and a Ph.D. in Theoretical Physics from the Soviet Academy of Sciences. *Id.* at 4–5. His resume also detailed years of experience in trading equities. *Id.* at 5. Aksman also represented to Gene Reilly ("Reilly"), Greenwich's chief investment officer, that he was then managing a $10 million personal equity account housed at Wedbush Securities ("Wedbush") on behalf of Stefano Brocco ("Brocco"), a partner at A.R.T. Advisors. *Id.* In support of this representation, Aksman gave Reilly purported Wedbush Equity Summary Reports, which reflected highly successful trading in Brocco's account. *Id.* Aksman also provided Greenwich with purported tax returns consistent with the compensation he claimed to be earning while managing Brocco's account. *Id.* Aksman represented to Reilly that he was unable to provide audited financials from the Brocco account

---

[1] The facts are drawn from the Award, Dkt. 9, Ex. D; Aksman's amended verified petition to vacate the Award, Dkt. 1 ("Petition"); Greenwich's opposition to the petition to vacate, Dkt. 8, 11 ("Greenwich Opp."); the declaration of Serine Consolino, Esq. ("Consolino Decl.") in support of the opposition, and attached exhibits, Dkts. 9, 12; the declaration of Gene Reilly ("Reilly Decl.") in support of the opposition, and attached exhibits, Dkts. 10, 13, including the parties' March 2019 Employment Agreement, Dkt. 10, Ex. D ("Employment Agreement"); Aksman's reply, Dkt. 15 ("Aksman Reply"), and declaration, Dkt. 16 ("Aksman Decl."), and accompanying exhibits, in further support of his petition; Greenwich's cross-motion to confirm the Award, Dkt. 22 ("Cross-Pet."); Greenwich's memorandum of law in support, Dkt. 23; the affidavit of Serine Consolino, Esq. Dkt. 22 ("Cross-Pet. Consolino Aff."), and accompanying exhibits, in support of Greenwich's cross-motion; and the transcript of argument, held on August 27, 2021 ("Arg. Tr.").

because his investment advisory agreement with Brocco prohibited such disclosure. *Id.* This seemed plausible to Reilly. *Id.*

Greenwich and Aksman entered into two agreements governing Aksman's employment: an Employment Agreement and a Restrictive Covenants Agreement ("RCA"). The operative versions of each were dated March 7, 2019. *Id.*; *see also* RCA.

The Employment Agreement set out the terms of Aksman's compensation and benefits. Important here, it specified that Aksman's employment would commence only after Greenwich "rais[ed] sufficient investor capital to support a minimum of $250,000,000 Gross Market Value ('GMV') in trading positions ('the Capital Raise') as of June 30, 2019 (the 'Closing Date')." Employment Agreement at 1. That date was later extended by agreement to August 31, 2019. *See* Reilly Decl., Ex. E.

The RCA imposed certain confidentiality and non-compete provisions, and in addition, provided for binding arbitration "[i]n consideration of Employee's employment or engagement with [Greenwich]." *See* RCA § 8(b)(i). Like the Employment Agreement, the RCA's continued validity was "conditioned upon the Employee's commencing employment with [Greenwich]." *Id.* § 8(i). The RCA specified that if Aksman did not commence employment, the RCA would be "void ab initio." *Id.*

From 2017 and until his fraud was discovered in 2019, Aksman repeatedly touted to Greenwich and potential investors the success of the Brocco account that he was purportedly managing. *See* Award at 6. For example, at a July 2019 meeting, Aksman shared details about the Brocco account with representatives from Morgan Stanley Alternative Investment Partners. *Id.* Apart from Aksman's representations to investors, Greenwich used the Brocco account's purportedly successful performance to promote the fund to some 70 prospective investors. *Id.*

3

Aksman also provided purported updates about the Brocco account to Greenwich, including by emailing monthly trading updates. *Id.* at 5.

Aksman's claims about the Brocco account unraveled during summer 2019, after Greenwich hired James Alpha ("Alpha"), an investment advisor, to assist in marketing the fund. Alpha sought to create an account that would track Aksman's trading in the Brocco account, so that Greenwich could generate an audited record of Aksman's performance. *Id.* at 6–7. Alpha sought to use Wedbush, the same prime broker Aksman claimed to use for the Brocco account. But, on September 10, 2019, when Reilly and Alpha's representatives called Wedbush and asked to establish an account with the same parameters as the Brocco account, Sean Trager ("Trager"), a Wedbush Vice President, informed them that no such account existed in Wedbush's systems. *Id.* at 7.

Aksman gave various explanations for the missing account. Each attempt to cover his tracks contradicted the previous one. Aksman first claimed that Trager was mistaken. *Id.* Then Aksman claimed that Trager was barred from discussing the account due to privacy considerations. *Id.* On September 23, 2019, Greenwich obtained an email exchange between Trager and Aksman, in which Trager wrote, "[y]ou know full well there is no active account [at Wedbush] and that more specifically there is no cash on deposit or positions." *Id.* On October 3, 2019, during a conference call with Reilly and others, Aksman stated that the account had been closed more than one year earlier. *Id.* Later, in an October 12, 2019 email, Aksman said that the account had been closed at the end of 2018. *Id.* In fact, as eventually emerged, neither Aksman nor his company had maintained any equity account at Wedbush during the preceding five years. *Id.* at 8.

4

Greenwich's fund ultimately did not raise the requisite $250 million that would have triggered Aksman's employment with the fund, pursuant to the Employment Agreement.[2]

### 2.    The Arbitration

On November 8, 2019, Greenwich submitted to Judicial Arbitration & Mediation Services ("JAMS") a demand for arbitration ("Demand") seeking approximately $10 million in damages from Aksman. *Id.* at 2.   The Demand alleged that Aksman had committed a "two-year-long fraud against Greenwich, in which Aksman repeatedly deceived Greenwich about his resume and track record, and falsified return summaries for an equity investment account he claims to have managed—but which, as it appears, does not actually exist." Consolino Decl., Ex. E, at 1.   Greenwich asserted that the RCA, signed by both Greenwich and Aksman, "contain[ed] the parties' explicit agreement to arbitrate." *Id.* at 2.

Specifically, the Demand quoted from RCA § 8(b):

(i) In consideration of Employee's employment or engagement with the Company, his promise to arbitrate all employment or service related disputes and Employee's receipt of the compensation and other benefits paid to Employee by the Company, at present and in the future, EMPLOYEE AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, STOCKHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM EMPLOYEE'S EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION. Employee agrees to arbitrate such disputes, and thereby agrees to waive any right to a trial by jury, including any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the New York State Labor Law, claims of

---

[2] The Award found that Greenwich had a "$150 [million] commitment from a large state pension fund which, but for Aksman's fraud, would have permitted it to launch its fund." Award at 11. Although not necessary to this decision, it therefore appears that although the $250 million capital raise was necessary to trigger Aksman's employment, a lesser amount would have enabled the fund to open.

harassment, discrimination or wrongful termination and any statutory claims. Employee further understands that this agreement to arbitrate also applies to any disputes that the Company may have with Employee.

(ii) Employee agrees that any arbitration will be administered by Judicial Arbitration & Mediation Services ("JAMS"), or its successor, pursuant to its Comprehensive Arbitration Rules and Procedures and JAMS appellate procedures (such rules and procedures, the "Procedure") before a sole arbitrator who shall be a lawyer. Employee agrees that the arbitration will be conducted in New York, New York. Employee agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. Employee also agrees that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law and that any decision or judgment of the arbitrator will be enforceable in any court of competent jurisdiction. Employee agrees that the decision of the arbitrator shall be in writing and shall be binding upon Employee and the Company.

*See* RCA § 8(b)(i), (ii). The Demand asserted one claim—fraud—and sought $1.2 million in compensatory damages; $2.9 million in lost profit damages; $5 million in punitive damages; attorneys' fees and costs; and pre-judgment interest.

In light of Aksman's claim here that he was never served with notice of the Demand, the Court sets out the occasions on which, according to Greenwich, *see* Greenwich Opp. at 6–8; Award at 2–3, 9, Greenwich served or attempted to serve Aksman with notice of the Demand before the arbitration hearing:

- On or about November 8, 2019—the same day Greenwich filed the Demand—counsel for Greenwich emailed Aksman a courtesy copy of the Demand at the same email address Aksman had used regularly to correspond with Greenwich. *See* Consolino Decl. ¶ 2.

- The same day, Greenwich sent a copy of the Demand to Aksman's consulting firm address by FedEx Overnight. *Id.* ¶ 3.

- On or about November 20, 2019, Greenwich mailed via FedEx overnight a copy of the Demand to Aksman's home address in North Plainfield, New Jersey. *Id.* ¶ 4. An individual at that residence rejected the package, claiming that no one by the name of Michael Aksman lived there. *Id.* ¶ 5.

- On November 22, 2019, in the first of several attempts at personal service, Greenwich dispatched a process server to Aksman's home addresss.  Consolino Decl., Ex. F.  An older woman—later identified as Aksman's housekeeper—told the process server that Aksman was in California.  *Id.*  The process server made five additional attempts to serve Aksman at his home address.  *Id.*

- On December 10, 2019, the process server spoke to a female resident of Aksman's home—who identified herself as Aksman's wife, Maria T. Aksman ("Ms. Aksman")—who informed him that Aksman had moved to California and claimed not to have an address for him there.  *Id.*

- In January 2020, Greenwich retained the services of a private investigator to further attempt personal service on Aksman.  Greenwich Opp. at 7.  On January 16, 2020, the investigator, Kenneth Cummings ("Cummings"), drove to Aksman's home.  Consolino Decl., Ex. G.  Cummings observed a vehicle registered to Ms. Aksman in Aksman's home driveway.  *Id.*  Cummings then knocked on the door, and handed a copy of the Demand to a woman who identified herself as Ms. Aksman.  *Id.*  Ms. Aksman told Cummings that Aksman was in California and that she did not have an address for him.  *Id.*  Five minutes later, after Cummings had pulled over nearby the house to take notes and make a call, Cummings noticed the car that had been registered to Ms. Aksman pull up beside him and stopped at a stop sign at the same intersection.  *Id.*  Cummings recognized Aksman sitting in the passenger seat of the car from social media pictures.  *Id.*  Cummings walked over to the side of the car, and Aksman partially lowered his window.  *Id.*  As Cummings attempted to hand Aksman the Demand, Aksman pushed the papers out of the vehicle and the car drove away.  *Id.*

- Later, Greenwich and JAMS, independently, continued to serve Aksman with all filings related to the arbitration via FedEx, USPS, and his email address.  Aksman was sent copies of the preliminary conference report setting the arbitration hearing for April 16, 2020, Greenwich's discovery requests, and its witness list.  *See* Consolino Decl. ¶¶ 7–11.[3]

Aksman did not respond to any of these communications.

On April 16, 2020, the arbitration was held via Zoom teleconference.  It was presided over by Frank Maas, a JAMS arbitrator and a former United States Magistrate Judge in this

---

[3] The arbitrator's findings as to service largely tracked Greenwich's assertions regarding its attempts, but included fewer instances of attempted service than Greenwich claims in its opposition to the petition to vacate.  Specifically, the Award did not include Greenwich's FedEx delivery to Aksman's consulting firm on November 8, 2019, or the six attempts the initial process server made before Greenwich hired Cummings.

District.  Award at 3; Consolino Decl., Ex. C.  During the hearing, Greenwich presented live

testimony from Reilly and declarations from Trager and its counsel, Paul C. Rauser, Esq., and

introduced more than 90 exhibits.

### 3.   The Award

Judge Maas issued the Award on June 26, 2020.  He held Aksman liable for fraud, and

awarded Greenwich damages of $4,030,982.58, consisting of compensatory and punitive

damages.  The Court summarizes here the Award's findings as to service, jurisdiction, and the

merits.

#### a.  Service

Because Aksman had failed to appear, the Award addressed at the threshold whether

Greenwich's attempts to serve and notify him of the proceeding complied with due process.  The

Award found that they did.  It found that several means of service used by Greenwich complied

with New Jersey law governing service.  That law applied because Delaware law (which under

the RCA governed the parties' relationship) permits service of process to be made in any manner

permissible under the laws of the state where service is made, and here, service had been

attempted at Aksman's residence in New Jersey.  Award at 9 (citing Del. Code Ann. tit. 10, §

3104(d)(2)).  Specifically, the Award found valid service when: "(i) a woman, presumably

Aksman's wife, accepted a copy at his residence, and (ii) [Aksman] himself was given a copy a

little while later, although he pushed the papers out of the vehicle in which he was riding before

he was driven away." *Id.*  The Award added: "Moreover, Aksman received a copy of the

Demand from counsel via email and there is no indication that he had abandoned his email

address by the time it was sent.  Indeed, since the initial service of the Demand, Aksman has

repeatedly received emails from JAMS concerning procedural aspects of the case, none of which

bounce back as undeliverable." *Id.*  In these circumstances, the Award concluded, "it is clear

8

that Aksman has received sufficient notice of the Demand and the relief that Greenwich is seeking." *Id.*

### b.  Jurisdiction

Judge Maas set out the basis for finding arbitral jurisdiction in the Preliminary Conference Report, issued on February 4, 2020.  That basis was Greenwich and Aksman's "agreement to arbitrate," as set out in Section 8(b) of the RCA.  Consolino Decl., Ex. C.

### c.  Merits

Based on the evidence adduced, the Award found, as Greenwich had alleged, that Aksman had repeatedly lied about the existence of, and his achievements with respect to, the Brocco account.  He did so, the Award found, to Greenwich, to induce Greenwich to hire him, and thereafter both to Greenwich and to potential investors whom Greenwich and he were attempting to court.  Award at 5–8.  Applying Delaware law, the Award concluded that Aksman had defrauded Greenwich.  Specifically, it found:

> First, as Trager's declaration establishes, the repeated statements that Aksman made to Greenwich and others concerning his trading of an equities account at Wedbush for Brocco were a complete fabrication.  Moreover, these false statements obviously were material since they induced Greenwich to hire Aksman as a portfolio manager.   Second, Aksman unquestionably must have known his statements were false since he eventually conceded that he had not been managing an account for Brocco at Wedbush at the time they were made.   Although Greenwich undertook efforts to verify Aksman's representation, it is also apparent that the firm was unaware of the fraud since someone of Reilly's stature in the investment community would not have attempted to market a fund based on Aksman's alleged trading prowess had he known the truth.  Third, it is clear that Aksman lied to Greenwich simply so that the firm would give him a job—and other benefits—for which he otherwise would have been ineligible.  Finally, because Greenwich spent considerable sums to launch the fund that Aksman had been retained to spearhead, there can be no question that Greenwich's reliance on Aksman's misrepresentation has caused it considerable financial harm.

*Id.* at 9–10.

The Award calculated that Greenwich was due $3,280,982.58 in compensatory damages, which reflected the year of lost profits that Greenwich had been denied due to the delay Aksman's fraud had caused in the launch of the fund, as well as attorneys' fees, and the arbitrator's fees and expenses. *Id.* at 11–13. Greenwich was also awarded $750,000 in punitive damages, based on Judge Maas's finding that Aksman's fraud had been particularly "brazen." *Id.* at 14. Total damages were thus $4,030,982.58.

### 4.      This Litigation

On August 28, 2020, Aksman filed a petition to vacate the Award in New York State Supreme Court in Manhattan. *See* Petition. In his petition to vacate, Aksman made four arguments. First, he argued that the Notice of Arbitration was never properly served on him. In so arguing, he disputed that the in-person attempt to serve him and his wife occurred, although he did not disclaim the email address to which communications about the Arbitration were sent. *See id.* ¶¶ 17(a), 44–52. Second, Aksman argued, because Greenwich's fund never attained $250 million in gross market value ("GMV"), he never became an employee of Greenwich, and the RCA and Employment Agreement, conditioned on reaching that milestone, never became effective. *See id.* ¶ 17(b), (d). Third, Aksman argued, the RCA was made without consideration, and was therefore "null and void." *Id.* ¶ 17(c). And fourth, Aksman argued that the Award was not supported by the evidence, violated public policy, and was arbitrary and capricious. *Id.* ¶ 17(e).

On September 29, 2020, Greenwich removed the case to this District. Dkt. 1. On October 6 and 7, 2020, Greenwich filed its opposition to the petition to vacate, supported by declarations and exhibits. *See* Dkts. 8–13. It argued that Aksman had been properly served and, on notice of the arbitration and having chosen not to participate, had waived his right to challenge the Award. *See* Greenwich Opp. at 10, 13. Greenwich also argued that whether its

dispute with Aksman was arbitrable was for the arbitrator to decide; that the arbitrator's decision was not judicially reviewable; and that, in any event, there was a valid, enforceable agreement to arbitrate that covered the dispute, such that the arbitrator was correct to find the dispute arbitrable. *Id.* at 15. Finally, Greenwich argued that Aksman had not met the high burden necessary to overturn the Award. *Id.* at 21.

On October 20, 2020, Aksman filed a reply, supported by a declaration from Aksman and accompanying exhibits. Dkts. 15, 16.

On December 23, 2020, Greenwich filed a cross-petition to confirm the Award, along with a supporting memorandum, declaration, and exhibits. Dkts. 22, 23. On January 21, 2021, Aksman filed his opposition. Dkt. 25.

On August 5, 2021, the Court scheduled argument on two issues: whether, assuming that Aksman had been properly served and nonetheless did not participate in the arbitration, he had preserved his right thereafter to challenge the arbitrability of the dispute by timely filing a petition to vacate, Dkt. 6 (citing case authority); and whether the issue of arbitrability had been delegated to the arbitrator, or was a question for the Court, *id.*  On August 27, 2021, the Court heard argument on these and associated issues.

## II.   Discussion

Aksman's petition to vacate and Greenwich's mirror-image petition to confirm the Award raise, in sequence, three sets of issues. First, did Aksman have notice of the arbitration, based on Greenwich's attempts to serve him with the Demand?  Second, was Greenwich's claim of fraud against Aksman arbitrable?  That issue embeds a series of questions: (a) whether there was an agreement to arbitrate; (b) whether the parties delegated the issue of arbitrability to the arbitrator to decide; (c) whether Aksman waived his right to challenge the determination of arbitrability by not participating in the arbitration; and (d) on the limited judicial review that

would be proper had Aksman not waived altogether his right to challenge the finding of arbitrability, whether there is a basis for the Court to overturn that finding. Third, again on the limited judicial review that is proper, do the Award's findings of liability for fraud and damages $4,030,982.58 merit confirmation or require vacatur? The Court considers those questions, after first reviewing the governing legal standards.

## A.    Applicable Legal Standards

The Federal Arbitration Act ("FAA") provides a "streamlined" process for a party seeking a "judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008). Section 9 of the FAA provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected . . . .

9 U.S.C. § 9.

### 1.    Vacatur

A party seeking to vacate an arbitral award faces an imposing standard of review. Judicial review of such awards is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (internal quotation marks and citations omitted). A reviewing court owes "strong deference" to "arbitral awards and the arbitral process," *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007), and a party seeking to vacate an award "must clear a high hurdle," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

12

"It is not enough for [a] petitioner[] to show that the panel committed an error—or even a serious error." *Id.* Rather, under the FAA, "[i]f there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award." *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.*, 103 F.3d 9, 13 (2d Cir. 1997) (quoting *Matter of Andros Compania Maritima, S.A.*, 579 F.2d 691, 704 (2d Cir. 1978)). Courts have authority to vacate arbitral awards only in narrow, enumerated circumstances, such as "where there was evident partiality . . . in the arbitrators," 9 U.S.C. § 10(a)(2); "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown," *id.* § 10(a)(3); or "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id.* § 10(a)(4).

An award may also be vacated if it "exhibits a manifest disregard of the law." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008), *rev'd and remanded on other grounds*, 559 U.S. 662 (2010) (internal quotation marks omitted). But that standard, rather than substantially broadening the grounds for vacatur, largely operates "as a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA." *Id.* at 94. Vacatur of an arbitral award for manifest disregard of the law "is a doctrine of last resort," reserved for "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). Manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). It applies where: (1) "the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the

arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) "the arbitrator . . . kn[ew] of its existence, and its applicability to the problem before him." *Duferco Int'l Steel Trading*, 333 F.3d at 390.

### 2.    Confirmation

The confirmation of an arbitral award generally is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court, and the court must grant the award unless the award is vacated, modified, or corrected." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). In this Circuit, "[t]he showing required to avoid summary confirmation of an arbitration award is high." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12. But "[a]rbitration awards are not self-enforcing"; "they must be given force and effect by being converted to judicial orders by courts." *Power Partners MasTec, LLC v. Premier Power Renewable Energy, Inc.*, No. 14 Civ. 8420 (WHP), 2015 WL 774714, at *1 (S.D.N.Y. Feb. 20, 2015) (internal quotation marks omitted) (quoting *D.H. Blair & Co*, 462 F.3d at 104).

"A petition to confirm an arbitral award is 'treated as akin to a motion for summary judgment.'" *STX Pan Ocean Shipping Co. v. Progress Bulk Carriers Ltd.*, No. 12 Civ. 5388 (RJS), 2013 WL 1385017, at *2 (S.D.N.Y. Mar. 14, 2013) (quoting *D.H. Blair & Co.*, 462 F.3d at 109). To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to

14

particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.    Adequacy of Service of Process

In pursuing vacatur, Aksman argues, first, that Greenwich did not properly serve him. That argument is easily put aside, based on the Award's findings as to service, which are substantiated by the evidence adduced by Greenwich.

Under the FAA, the "standards for service are liberally construed." *Townsend v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 18 Civ. 5939 (AJN), 2019 WL 4511696, at *2 (S.D.N.Y. Sept. 19, 2019) (quoting *Novorossiysk Shipping Co. v. China Pac. Prop. Ins. Co.*, No. 06 Civ. 2312 (WHP), 2006 WL 3055964, at *2 (S.D.N.Y. Apr. 17, 2006) (collecting cases)). Failure to comport with formal rules for service will not warrant vacatur if the party claiming insufficient service of process had actual or constructive notice of the arbitration. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 845 (2d Cir. 1977); *Gill v. Fin. Indus. Regul. Auth.*, No. 11 Civ. 2713 (PAC) (RLE), 2013 WL 1203746, at *3 (S.D.N.Y. Mar. 6, 2013), *report and recommendation adopted*, No. 11 Civ. 2713 (PAC) (RLE), 2013 WL 1201499 (S.D.N.Y. Mar. 25, 2013); *Smith v. Positive Prods.*, 419 F. Supp. 2d 437, 446 (S.D.N.Y. 2005); *Marsillo v. Geniton*, No. 03 Civ. 2117 (TPG), 2004 WL 1207925, at *6 (S.D.N.Y. June 1, 2004); *Matter of Lauritzen Kosan Tankers (Chem. Trading, Inc.)*, 903 F. Supp. 635, 637 (S.D.N.Y.

1995). A showing of a lack of actual or constructive notice, however, may warrant vacatur. *See*

*Marsillo*, 2004 WL 1207925, at *5–6; *Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*, 519

F.3d 200, 208 (4th Cir. 2008). The Court's review of sufficiency of service in this context is thus

narrow. It is limited to whether "the arbitrat[or's] decision that notice was adequate constituted

misconduct or misbehavior affecting [Aksman's] rights," such that fundamental fairness is

violated. *Marsillo*, 2004 WL 1207925, at *6 (citing 9 U.S.C. § 10(a)(3)).

Here, the arbitrator reasonably found multiple instances of such notice, based on the

evidence adduced by Greenwich of its repeated efforts to serve Aksman. He held that Aksman

had received notice, on account of his having been served twice and having been emailed and

mailed notices of the arbitration numerous times. Award at 8–9. These familiar modes of giving

notice comported with fundamental fairness. And the arbitrator was well within his authority to

credit the evidence that service by such means had occurred. And critically, although contending

that he did not receive in-person notice on either occasion found by the arbitrator, Aksman does

not dispute that the email address to which notices of the arbitration were sent was his, or that he

actually had received the emailed notifications that Greenwich sent him. *See* Petition ¶¶ 44–52.

Akman instead argues that the emails he received were legally insufficient as a means to

give him notice. *See* Aksman Reply at 3 ("[A]ny argument presented by [Greenwich] that

[Aksman] was on notice by 'email' or any other method of service is of no import as it is

violative of the statutory requirement for arbitrations commenced in New York State."). But

even if such emails had been the only means by which Aksman was given notice, Greenwich's

ostensible failure to observe procedural formality in effectuating service of process would not be

a basis to grant him relief, as "the formalities of notice are not a basis for vacating the award."

*Gill*, 2013 WL 1203746, at *3. Rather, to establish a violation of fundamental unfairness,

Aksman would have to show that he had no notice whatsoever. *Id.* Aksman has not so shown—or even claimed.

The Court accordingly rejects Aksman's challenges to service as basis for vacating the Award.

### C.    Arbitrability of Greenwich's Claim

Aksman next argues that the arbitrator lacked jurisdiction over Greenwich's fraud claim against him—*i.e.*, that that claim was not arbitrable.

#### 1.    Agreement to Arbitrate

At the outset, it is important to identify the narrow basis for this argument. Aksman does not dispute that—as the arbitrator found—there was an agreement between Greenwich and him to arbitrate their disputes: RCA § 8(b) contained an explicit agreement between him and Greenwich to do so.[4] Nor does Aksman contend that Greenwich's claim of fraud was outside the scope of that agreement. Under § 8(b), Aksman agreed that "any and all controversies, claims or disputes with anyone (including the company [Greenwich] . . .) arising out of, relating to, or resulting from employee's employment with the company or the termination of employee's employment with the company, including any breach of this agreement, shall be subject to binding arbitration." RCA § 8(b) (capitalization omitted). Greenwich's fraud claim—to the effect that Aksman repeatedly misled Greenwich, and its prospective investors, as to his track record as a fund manager—fell squarely within that provision.

---

[4] Aksman argues that that agreement lacked consideration, *see* Petition ¶ 17(c), but that claim is baseless. Section 8(b) recites various forms of consideration for Aksman's promise to arbitrate with Greenwich. These included Greenwich's reciprocal agreement to arbitrate, *see Charter Commc'ns, Inc. v. Garfin*, No. 20 Civ. 7049 (KPF), 2021 WL 694549, at *11 (S.D.N.Y. Feb. 23, 2021); *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 337 (S.D.N.Y. 2014), and Aksman's prospective employment with and contractual compensation by Greenwich.

Aksman's argument instead turns on a post-agreement event: Greenwich's failure to raise sufficient investor capital to support a minimum of $250 million in GMV.  Aksman argues that his employment was conditioned on Greenwich's meeting the GMV target, in that the Employment Agreement stated that, if Greenwich did not do so, "this agreement shall be void." *See* Employment Agreement at 1.  Aksman argues that the RCA was keyed indirectly to the GMV target, because it provided that "[t]he effectiveness of this Agreement shall be conditioned upon the Employee's commencing employment with the Company.  In the event that the Employee does not commence employment with the Company, this agreement shall be void ab initio." *See* RCA § 8(i).  Aksman argues that, considering the Employment Agreement and the RCA together, Greenwich's failure to achieve the GMV target means that he never commenced employment, and because the RCA was "void ab initio" if Aksman never did so, the provision of the RCA containing the agreement to arbitrate was itself void, making Greenwich's claims non-arbitrable. *See* Aksman Reply at 7–8.

Were it considered *de novo*, Aksman's textual argument would be colorable, although Greenwich would have had—at a minimum—colorable textual counter-arguments.  However, as Greenwich notes, a threshold question, given the existence of an agreement to arbitrate between the parties, is whether the decision as to arbitrability—to wit, whether the parties' agreement to arbitrate disputes within the scope of § 8(b) remained effective (as Greenwich contends), or whether it was voided *nunc pro tunc* by Greenwich's failure to meet the GMV target (as Aksman argued)—was delegated to the *arbitrator* to decide.

### 2.     Delegation of Authority to the Arbitrator to Resolve this Dispute

Two lines of Supreme Court precedent bear on the question of who decides arbitrability. The first, culminating in *First Options of Chi., Inc. v. Kaplan*, requires courts to examine whether the parties intended to delegate the issue of arbitrability to an arbitrator.  514 U.S. 938,

18

944 (1995). The second, articulated first in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, requires courts to examine how parties frame their challenge against arbitration. 388 U.S. 395, 406 (1967). Under the *Prima Paint* line of cases, arbitration agreements are "severable" from the agreements that contain them. Only challenges that are addressed specifically to the arbitration agreement may be considered by the court in the first instance. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006). Here, both lines of precedent compel the Court to conclude that the issue of arbitrability was for the arbitrator to decide.

Pursuant to *First Options* and its progeny, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options*, 514 U.S. at 944 (1995) (internal quotation marks omitted). To determine the parties' intent, courts "apply ordinary state-law principles that govern the formation of contracts." *Id.* Critical here, since *First Options*, courts, applying contract formation principles, have found "clear and unmistakable evidence" allocating decisions as to arbitrability to the arbitrator when the parties, in designating an arbitral forum, have incorporated by reference forum rules giving the arbitrator the authority to make such decisions. Such has been held particularly warranted where the parties' agreement to arbitrate broadly committed their disputes to arbitration. *See Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014); *Doctor's Assocs., LLC v. Tripathi*, 794 F. App'x 91, 94 (2d Cir. 2019); *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021). In such circumstances, issues concerning arbitrability—including the interpretation, scope, or continuing validity of the underlying agreement—are for the arbitrator, not a court, to decide in the first instance. *See, e.g., Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72

(2010); *see also Jacobs v. U.S. Anti-Doping Agency*, No. 04 Civ. 1163 (BSJ), 2004 WL

5003951, at \*4 (S.D.N.Y. May 19, 2004) (where arbitration provision incorporated AAA rules,

"the parties . . . agreed that all questions regarding the existence, validity, and scope of their

arbitration agreement should be decided by an AAA arbitrator rather than by a court"), *aff'd sub*

*nom. Jacobs v. USA Track & Field*, 374 F.3d 85 (2d Cir. 2004).

Separately, in *Prima Paint* and cases thereafter, the Supreme Court has held repeatedly

that unless the parties provide otherwise, challenges to the underlying contract containing the

agreement to arbitrate—rather than to the agreement to arbitrate itself—are reserved for the

arbitrator. *See Prima Paint*, 388 U.S. at 406 (court may review only challenges to the arbitration

clause itself, not challenges to container contract); *Buckeye*, 546 U.S. at 445–46 ("[U]nless the

challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the

arbitrator in the first instance."); *Rent-A-Ctr.*, 561 U.S. at 70–71.  Arguments that are directed at

the whole contract containing the agreement to arbitrate—*i.e.*, that the entire agreement is void

or has terminated—are for the arbitrator to decide.  *Prima Paint*, 388 U.S. at 403–04 (question of

fraud in inducement of contract was for arbitrator; only a claim of fraud in inducement of

arbitration clause itself would be for court to decide); *Rent-A-Ctr.*, 561 U.S. at 72 (failure to

challenge delegation to arbitrator specifically required arbitrator to determine arbitrability).  And

far from providing otherwise—as would be required to avoid the *Prima Paint* severability

principle—the parties here have explicitly provided *for* severability in their agreement:

"Severability: In the event that any one or more of the provisions of this agreement shall be or

become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability

of the remaining provisions . . . shall not be affected thereby."  RCA § 8(e).

These two principles yield a clear outcome here: that Greenwich and Aksman clearly and unmistakably agreed to delegate to the arbitrator broad authority to determine arbitrability, and that this authority extends to resolving whether, notwithstanding Greenwich's failure to achieve the GMV target, its claim of fraud was arbitrable. That is because the parties incorporated the rules of the JAMS arbitral forum into their agreement. *See* RCA § 8(b)(ii) ("[A]ny arbitration will be administered by [JAMS], . . . pursuant to its Comprehensive Arbitration Rules and Procedures and JAMS appellate procedures."). And, at all relevant times, those rules provided that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Rule 11(b).

Such forum rules, as courts have widely held, allocate arbitrability decisions to the arbitrator. *See, e.g.*, *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (finding delegation of arbitrability where the agreement stated that "the then-applicable rules of JAMS will apply"); *Simon J. Burchett Photography, Inc. v. Maersk Line Ltd.*, No. 20 Civ. 3288 (GBD) (RWL), 2020 WL 8261580, at *6 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted*, No. 20 Civ. 3288 (GBD) (RWL), 2020 WL 8261580 (S.D.N.Y. Mar. 18, 2021) (finding delegation of arbitrability where agreement stated "that any dispute under, concerning or relating to the terms and/or enforcement of this Agreement shall be submitted for binding non-appealable arbitration . . . pursuant to the JAMS Expedited Procedures."); *King v. Stage 29 Prods., LLC*, No. 19 Civ. 9549 (CM), 2020 WL 3577925, at *4 (S.D.N.Y. July 1, 2020) (finding delegation of arbitrability where agreement stated that "'the enforcement or scope of this agreement to

arbitrate or the arbitrability of such controversies, claims or disputes' to binding arbitration at the office of JAMS pursuant to JAMS Arbitration Rules"). And here, the parties' dispute—about whether the parties' agreement in the RCA that covered disputes be resolved in arbitration was contractually negated by Greenwich's failure to meet the GMV target—squarely concerns the "existence, validity, interpretation, or scope" of the arbitral agreement. JAMS Rule 11(b). *See Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 509 (1st Cir. 2020) (where contract interpretation was delegated to arbitrator, whether event triggered contract's termination was issue for arbitrator to decide).

Second, Aksman's challenges to arbitrability are directed to the agreement itself, not the validity of the agreement to arbitrate, and therefore implicate the *Prima Paint* severability principle. Aksman's claims are that: "[he] was never an employee of Greenwich; the [RCA] was made without any consideration is therefore null and void; [and] [t]he Employment Agreement only became effective upon conditions precedent that never occurred[.]" *See* Petition ¶ 17(b)–(d). None of these claims can be read to specifically target the agreement to arbitrate itself; each challenges the underlying agreement—here, both the RCA and the Employment Agreement—as a whole. Because Aksman's "challenge is [not] to the arbitration clause itself, the issue of the contract's validity [had to have been] considered by the arbitrator in the first instance." *Buckeye*, 546 U.S. at 445–46.

The question of arbitrability in this case—and whether the agreement had terminated—therefore was, in the first instance, for the arbitrator to decide.

### 3.   Review of Arbitrability and Waiver

The Court next considers its authority to review the arbitrator's decision that Greenwich's fraud claim was arbitrable. Greenwich argues that Aksman, by not participating in the JAMS

arbitration despite notice, has waived any right to challenge the arbitrability decision in court. *See* Greenwich Opp. at 14–19. For two independent reasons, Greenwich is right.

First, under a line of caselaw originating in the Eighth Circuit, a party that has chosen not to participate in arbitration despite notice of it may properly preserve its right to object to an arbitrator's substantive jurisdiction by filing a timely petition to vacate the award.[5] These precedents, however, are subject to a vital qualification: that the arbitration agreement have not clearly delegated the arbitrability decision to the arbitrator. Where there is such a delegation, a party's failure to participate in the arbitration waives its right to challenge the arbitrator's finding of arbitrability. *See Int'l Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1102 (8th Cir. 2004) (where party has notice of arbitration and fails to object or participate, and contract did not expressly delegate issue of arbitrability to the arbitrator, party may challenge the arbitrator's substantive jurisdiction by filing a timely motion to vacate, but has otherwise waived its rights to challenge arbitrator's determinations, including as to the merits); *Langlais v. PennMont Ben. Servs., Inc.*, No. Civ. 11-5275, 2012 WL 2849414, at *5 (E.D. Pa. July 11, 2012) (where agreement did not clearly specify who determines arbitrability, substantive arbitrability was a question for judicial determination, such that failure to appear at arbitration did not function as waiver), *aff'd*, 527 F. App'x 215 (3d Cir. 2013); *cf. Loc. Union No. 36, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Atlas Air Conditioning Co.*, 926 F.2d 770, 772 (8th Cir. 1991) (to preserve defense of nonarbitrability, party "should have notified the [arbitrator] of its refusal to arbitrate or brought an action to vacate the award, alleging the [arbitrator's] lack of jurisdiction"; decision does not specify whether agreement delegated arbitrability decision to

---

[5] This line of cases was not identified or briefed by the parties. The Court ordered oral argument on it, Dkt. 26, which was held on August 27, 2021.

arbitrator); *see also Loc. 377, RWDSU, UFCW v. 1864 Tenants Ass'n*, No. 06 Civ. 1190 (LBS), 2007 WL 634751, at *13 (S.D.N.Y Mar. 1, 2007) (treating substantive jurisdictional objections as waived where "the employer made no attempt to advise the arbitrator prior to the arbitration that it was questioning the arbitrator's authority, nor did it file a petition with the court to vacate the arbitration award"; decision does not specify whether agreement delegated arbitrability decision to arbitrator), *aff'd*, 533 F.3d 98 (2d Cir. 2008). The facts here make out a waiver, insofar as the arbitral agreement clearly left the question of arbitrability to the arbitrator, yet Aksman, despite notice, did not participate in the arbitration. *See Hope Elec. Corp.*, 380 F.3d at 1103 ("Our holding, of course, is limited to the facts of this case. In a situation where the parties' . . . agreement clearly apportions to the arbitrators not only the authority to resolve the merits of a grievance, but also the power to resolve underlying issues of arbitrability, there is not a similar rationale to excuse a party's failure to first offer the arbitrators themselves an opportunity to address the issue of arbitrability.").

Second, the JAMS Rules to which Aksman bound himself prohibit a party subject to a demand to arbitrate from challenging arbitrability for the first time in court. JAMS Rule 9 provides that "[j]urisdictional challenges under Rule 11 [which governs jurisdictional and arbitrability disputes] shall be deemed waived unless asserted in a response to a Demand or counterclaim or promptly thereafter, when circumstances first suggest an issue of arbitrability." Aksman, however, did not challenge arbitrability at any point after receiving Greenwich's Demand. He chose instead to first challenge arbitrability in court, in his post-arbitration motion to vacate. Under the forum rules, this functioned as a waiver. *See Steinmann v. ZTE Corp.*, 692 F. App'x 493, 494 (9th Cir. 2017) (holding parties bound by arbitral forum's waiver rule); *Stotter Div. of Graduate Plastics Co. v. Dist. 65, United Auto Workers, AFL-CIO*, 991 F.2d 997, 1002

(2d Cir. 1993) (holding parties bound by incorporated AAA waiver rule as it related to failure to timely object to arbitrator); *Chopper Trading LLC v. Allston Trading LLC*, No. 19 Civ. 01674, 2021 WL 3709188, at *6 (N.D. Ill. Aug. 20, 2021) (finding parties bound by CBOT waiver rule where parties incorporated CBOT rules by agreement).

The Court, accordingly, finds that Aksman has waived his right to challenge the arbitrability of Greenwich's claim.

In an excess of caution, however, the Court will conduct the limited review appropriate for a non-waived challenge to an arbitrator's finding of arbitrability where that decision was delegated to the arbitrator.[6] *See First Options*, 514 U.S. at 943 ("Did the parties agree to submit the arbitrability question itself to arbitration? If so, then the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate.").[7]

On that deferential standard, Judge Maas's arbitrability finding was clearly sustainable. That finding, as noted, was based on the parties' agreement to arbitrate, reflected in RCA § 8(b). No doubt because Aksman chose not to participate and present contrary arguments, Judge Maas did not consider the implications of Greenwich's failure to meet the contractual GMV target, or

---

[6] If the parties had not delegated arbitrability to the arbitrator, and there had not been a waiver of the issue, the Court would review the arbitrator's finding of arbitrability *de novo. See, e.g., S & G Flooring, Inc. v. New York City Dist. Couns. of Carpenters Pension Fund*, No. 09 Civ. 2836 (NRB), 2009 WL 4931045, at *5 (S.D.N.Y. Dec. 21, 2009).

[7] At argument, Greenwich argued that the decision in *Henry Schein, supra*, precludes any judicial review of an arbitrator's decision as to arbitrability where the parties' agreement delegated that decision to an arbitrator. *See* Arg. Tr. at 18. That is wrong. *Henry Schein* categorically precludes courts from taking the question of arbitrability away from an arbitrator when that question has been delegated to the arbitrator. But the Supreme Court explicitly recognized that courts may review such decisions, subject to the limited review authorized by the FAA. *See Henry Schein*, 139 S. Ct. at 530.

the argument Aksman now makes about the interplay under such circumstances between RCA §

8(b) and 8(i).  But under the highly deferential standard of review required, *see id.*, that is not

cause to vacate the Award.  An arbitrator is not obliged to document his reasoning or factual

findings; a court must confirm an award so long as "any colorable justification" supports the

decision.  *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2d Cir. 2002) (quoting

*Fahnestock & Co. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991)); *Wallace v. Buttar*, 378 F.3d

182, 190 (2d Cir. 2004) (award will be enforced "despite a court's disagreement with it on the

merits, if there is a *barely colorable justification* for the outcome reached") (emphasis in

original) (internal quotation marks and citation omitted); *Abondolo v. Jerry WWHS Co.*, 829 F.

Supp. 2d 120, 129 (E.D.N.Y. 2011) ("[A]rbitrators are not required to document their

reasoning."); *D.H. Blair & Co.*, 462 F.3d at 110 ("[T]he award should be confirmed if a ground

for the arbitrator's decision can be inferred from the facts of the case.") (internal quotation marks

and citations omitted).

And here, for at least two reasons, there was, at least, a colorable justification on which

an arbitrator could find—notwithstanding Greenwich's failure to reach the funding target—that

the agreement to arbitrate remained in effect.

First, Greenwich could colorably argue that § 8(e), the severability provision of the RCA,

bespoke an intent for the arbitration obligation to survive the termination, or the non-initiation, of

Aksman's formal employment.  In so arguing, Greenwich, too, could draw upon substantial

caselaw that, absent a clear contrary indication, the agreement to arbitrate survived the

termination of the parties' underlying agreement.  *See Nolde Bros., Inc. v. Local No. 358, Bakery*

*& Confectionery Workers Union*, 430 U.S. 243, 253–55 (1977) ("[I]n the absence of some

contrary indication, there are strong reasons to conclude that the parties did not intend

their arbitration duties to terminate automatically with the contract."); *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 205–08 (1991); *Newspaper Guild/CWA of Albany v. Hearst Corp.*, 645 F.3d 527, 530 (2d Cir. 2011); *Butchers, Food Handlers & Allied Workers Union, Local 174 v. Hebrew Nat. Kosher Foods, Inc.*, 818 F.2d 283, 287 (2d Cir. 1987) ("If the contract does not state that the duty to arbitrate ends with the termination of the contract, the strong policies favoring arbitration should ordinarily lead the court to conclude that the obligation to arbitrate—especially as to claims that accrued during the term of the contract—survives the expiration of the contract."). *See Watson v. USA Today Sports Media Grp., LLC*, No. 17 Civ. 7098 (NRB), 2018 WL 2316634, at *5 (S.D.N.Y. May 8, 2018) (under the *Litton* line of cases, post-expiration disputes remain arbitrable when: "(1) the dispute involves facts and occurrences that arose before expiration; (2) post-expiration action infringes a right that accrued or vested under the agreement; and (3) under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement."). Further support for the argument that the parties intended the agreement to cover controversies outside the scope of Aksman's employment—and hence surviving the cessation or voiding of Aksman's employment—would come from the text of the arbitration provision itself, which contains Aksman's promise to arbitrate not only employment related disputes, but also "service related disputes." RCA § 8(b).

Second, Greenwich would have a colorable argument that RCA § 8(i) did not apply, because, in actuality, Aksman had "commenced employment," or at least had been "engage[d]" with Greenwich. *See* RCA § 8(b)(i) (providing for arbitration "[i]n consideration of Employee's employment or engagement"). As the evidence at the arbitration established, he worked in Greenwich's service, albeit making false statements to the company and its investors, for months

27

before Greenwich failed to reach its funding target and learned of Aksman's fraud. Although Aksman would have a counterargument based on the provision in the Employment Agreement stating that it was voided by the failure to raise sufficient GMV, Greenwich's argument that Aksman's antecedent work had been that of an employee—and that he therefore had "commenced employment"—or, at minimum, had been engaged with the company through that work, would be colorable.

For these reasons, the Court denies Aksman's challenge to the Award on the grounds that Greenwich's claim of fraud was non-arbitrable.

### D.    Merits

Aksman's final challenge is to the substance of the Award: its findings as to liability and damages. On the very limited review that is appropriate, the Court finds that summary judgment is warranted, for two independent reasons.

First, at argument, Aksman conceded that were the Court to find that he had notice of the arbitration, he necessarily waived all challenges to the substance of the Award, as opposed to arbitrability. *See* Arg. Tr. at 9. The Court, like Judge Maas, has so found. Aksman therefore has waived his right to challenge the Award on the merits. *See Cook Indus., Inc. v. C. Itoh & Co. (Am.) Inc.*, 449 F.2d 106, 107–08 (2d Cir. 1971) ("Appellant cannot remain silent, raising no objection during the course of the arbitration proceeding, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first."); *Sokolowski v. Metro. Transp. Auth.*, 723 F.3d 187, 191 (2d Cir. 2013) ("[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration.") (quoting *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003)).

Second, on its review of the arbitral record including the Award, which the Court found detailed and persuasive, Greenwich presented evidence sufficient—indeed, amply so—to establish both Aksman's liability for fraud and the damages award.  There is, at a minimum, a "barely colorable justification for the outcome reached." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 13 (citation omitted).

## CONCLUSION

For the reasons stated herein, the Court denies Aksman's petition to vacate the Award, and grants Greenwich's cross-petition to confirm the Award.  The Award is confirmed.  The Clerk of the Court is directed to terminate the motions at Dkt. 1 and Dkt. 22, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 28, 2021
      New York, New York